EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ANGEL LUCRET QUIÑONES, SECUNDINO OSORIO LÓPEZ, acusados y apelantes.

*Número:* CR-79-45    *Resuelto:* 10 de noviembre de 1981

Carmen Ana Rodríguez Maldonado, de la División de Apelaciones de la Sociedad para Asistencia Legal, abogada de los apelantes; Héctor A. Colón Cruz, Procurador General, y Rose Mary Corchado Lorent, Procurador General Auxiliar, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Examinamos la validez y aplicabilidad en nuestra jurisdicción bajo el Código Penal vigente de la doctrina anglosajona sobre asesinato estatutario (*Felony-murder rule*).

Loa antecedentes procesales se originan con las acusaciones presentadas contra los apelantes Ángel Luis Lucret Quiñones y Secundino Osorio López por los delitos de asesinato en primer grado, robo e infracción a los Arts. 6 y 8 de la Ley de Armas. El pliego acusatorio de asesinato les imputó que:

> Los referidos acusados, Secundino Osorio López y Angel Luis Lucret Quiñones, allá en o para el día 29 de noviembre de 1978, y en Aguas Buenas, Puerto Rico, que forma parte del Tribunal Superior de Puerto Rico, Sala de Caguas, Puerto Rico, ilegal, voluntaria, maliciosa y criminalmente, y actuando conjuntamente con un menor, con alevosía, malicia premeditada y deliberación, y con el propósito decidido y firme de matar, dieron muerte al ser humano Bernardo Díaz López, *en el momento en que intentaban perpetrar un robo*, a quien le ocasionaron heridas de bala en distintas partes del cuerpo de carácter grave, que le ocasionaron la muerte. (Énfasis nuestro.)

La prueba desfilada no contradicha y creída por el tribunal sentenciador, en síntesis demostró que los apelantes, en unión a otros dos, el 29 de noviembre de 1978, durante horas de la tarde, perpetraron un robo en una ferretería de Comerío. Llegaron los cuatro en un vehículo, dos se bajaron y utilizando como subterfugio el deseo de adquirir pintura y sus accesorios, encañonaron con un revólver al Juez de Distrito Osvaldo Rodríguez —quien se encontraba allí en calidad de cliente— lo despojaron de $400 y al dueño del negocio, bajo amenaza armada, le llevaron $2,000 de la caja registradora. Durante ese incidente Osorio disparó el arma que portaba. El apelante Lucret, quien conducía el automóvil permaneció junto a otro individuo en el mismo —cuyo motor estaba encendido— y dio instrucciones a sus cómplices de que se dieran prisa.

Mientras se llevaba a cabo este robo, el hijo del dueño de la ferretería, José A. Delgado, al oír la detonación se percató de lo que acontecía, vio a ambos apelantes y optó por perseguirlos en un vehículo del negocio en compañía de Juan Hernández y Francisco Delgado. Se dirigieron hacia Bayamón y luego a Aguas Buenas y localizaron el auto de los asaltantes frente al negocio denominado "Colmado Díaz" propiedad de Bernardo Díaz. Vieron a Lucret que estaba ante el volante del automóvil, lo encañonaron y amarraron. Oyeron entonces varias detonaciones provenientes del interior del colmado. De allí salieron Osorio —con una escopeta recortada— y un menor con un revólver manchado en sangre, que le fue arrebatado por el ciudadano Alquín Delgado Rodríguez. Osorio logró escapar, pero luego fue arrestado. En este asalto resultaron asesinados Bernardo Díaz y Juan A. Ortiz De Jesús.

Ante tribunal de derecho, fueron declarados culpables de todos los delitos imputados, y sentenciados a cumplir diversas penas de reclusión. No conformes con la convicción por el delito de asesinato apelaron señalándonos que:

Erró el Hon. Tribunal de Instancia al declarar a los acu-

sados culpables de asesinato en primer grado a base de la norma de "felony murder", cuando nada en la prueba demostró fehacientemente y más allá de duda, que la muerte ocurrió como consecuencia del robo perpetrado; y mucho menos que hubo participación directa del apelante Angel L. Lucret Quiñones en los actos conducentes al asesinato.

La petición central de los apelantes hemos de dividirla en tres aspectos, a saber: (1) la prueba no demostró más allá de duda razonable que la muerte ocurrió como consecuencia del robo perpetrado; (2) el apelante Ángel L. Lucret Quiñones no participó en la comisión del delito de asesinato por estar éste amarrado por los ciudadanos que se congregaron frente al negocio en los momentos del asalto; y (3) debe reevaluarse la vigencia del delito de asesinato estatutario (*felony-murder rule*) del Art. 83 del Código Penal. 33 L.P.R.A. sec. 4002.

En cuanto a esta doctrina se nos aduce que su subsistencia aleja nuestra jurisdicción de las corrientes modernas que tienden a restringirlo jurisprudencialmente, por resultar un anacronismo originado en el siglo XVI, y que "[t]al norma, al relevar al Estado de probar los elementos esenciales del Asesinato en Primer Grado; o en su defecto, transferir una intención de cometer un robo, como en el caso que nos ocupa, para que la misma supla todos los requisitos y elementos de un Asesinato en Primer Grado, resulta inherentemente injusta y es lógicamente insostenible en el Derecho Penal".

Procederemos a discutir y evaluar los méritos de los tres aspectos señalados, siguiendo nuestro propio orden. Examinemos primero el origen de la regla.

I

*Génesis y Trayectoria Histórica:*

De estirpe anglosajona, en términos generales la doctrina propugna que si una persona causa la muerte a otra al perpetrar o intentar perpetrar un delito grave (*felony*)

—sea intencional o no intencional o hasta accidentalmente— de existir en la mente del acusado la intención específica de cometer dicho delito grave, entonces la muerte constituye asesinato en primer grado. La premisa inarticulada en que se erige es que el elemento de malicia para causar la muerte está implícito en el acto de la comisión del delito grave. [1]

Su génesis jurisprudencial se sitúa en Inglaterra y se remonta al siglo XVI. Posteriormente se exportó a todo Estados Unidos, jurisdicciones estatales [2] y la federal, [3] al Canadá [4] y a otros países de tradición anglosajona. En Puerto Rico, según veremos, arribó a principios de este siglo.

Con frecuencia se ha señalado que la primera formulación formal de la doctrina se halla en el caso de *Lord Dacres*, Moore 86; 72 Eng. Rep. 458 (1535). [5] Por su valor histórico merece brevemente mencionarse su trasfondo de hechos: Lord Dacres y unos amigos decidieron entrar en un bosque sin permiso para cazar —lo cual es un acto ilegal— *y matar a cualquiera que les ofreciera resistencia.* Estando Lord Dacres a un cuarto de milla del lugar, uno de los miembros de su grupo mató a un guardabosques que les hizo frente. Aunque Lord Dacres no estaba pre-

---

[1] 1 Wharton's *Criminal Law and Procedure*, sec. 251, pág. 539 (1957); *United States* v. *Furlong*, 5 Wheat. 184, 5 L.Ed. 64 (1820), 40 Am.Jur.2d, sec. 72; R. Perkins, *Criminal Law*, Brooklyn, The Foundation Press, Inc., 1957, págs. 33–36; *Application of Felony-Murder Doctrine Where the Felony Relied upon is an Includable Offense Within the Homicide*, 40 A.L.R.3d 1341, 50 A.L.R.3d 239, 56 A.L.R.3d 397; *Lockett* v. *Ohio*, 438 U.S. 586 (1978).

[2] Véanse las anotaciones en 1 Wharton's, *op. cit.*, y el Código Penal Modelo, Draft Núm. 9, págs. 33–38.

[3] 18 U.S.C. secs. 1111, 1472, 113 y 2113. Véase *United States* v. *Herman*, 576 F.2d 1139 (1978).

[4] Canadá al adoptar en su Código el asesinato estatutario (Art. 202) siguió el Informe de la "Criminal Code Bill Comission" del año 1879.

[5] Crum, *Causal Relations and the Felony-Murder Rule*, 1952 Wash. U.L.Q. 191; Morris, *The Felon's Responsibility for the Lethal Acts of Others*, 105 U. Pa. L. Rev. 50, 58 (1956); Note, *Recent Extension of Felony Murder Rule*, 31 Ind. L.J. 534 (1956).

sente cuando ello ocurrió, él y sus compañeros fueron condenados por asesinato y ahorcados. Contrario a la interpretación de que ha sido objeto este caso por quienes le atribuyen la fuente de la doctrina, la decisión no se apoyó en que Lord Dacres y sus compañeros fueran culpables de asesinato porque habían emprendido una cacería ilegal en el curso de la cual habían dado muerte a una persona, sino más bien que aquéllos, aunque no presenciaron físicamente el acto, eran responsables como causantes del delito a base de la teoría de "presencia constructiva". Y aún más, todos los miembros del grupo compartieron la *mens rea* del crimen porque habían acordado de antemano matar a cualquiera que les ofreciera resistencia.[6] Por lo tanto, en la medida en que el caso de Lord Dacres envolvía malicia expresa, no fue necesario usar, como de hecho no se utilizó, doctrina alguna que determinara la existencia de malicia en la intención de cometer un acto ilegal.[7]

Otro de los primeros casos citados como fuente, decidido después de *Lord Dacres*[8] es *Mansell & Herbert*, 2 Dyer 128b; 73 Eng. Rep. 279 (1558). Allí Herbert y un grupo de más de 40 seguidores habían ido a la casa de Sir Richard Mansfield "para incautar bienes a la fuerza pretendiendo estar legalmente autorizados para ello". Uno de los siervos de Herbert le lanzó una piedra a una persona que se encontraba en el portón. En vez de darle a esta persona, la piedra alcanzó y mató a una mujer que salía de la casa de Mansfield. Se decidió que el planteamiento

---

[6] Kaye, *The Early History of Murder and Manslaughter*, Part II, 83 L.Q. Rev. 569, 578–579, 593 (1967). Véase además, *King* v. *Borthwick*, 1 Doug. 207, 212, 99 Eng. Rep. 136, 138–139 (1779).

[7] Note, *Felony Murder as a First Decree Offense: an Anachronism Retained*, 66 Yale L.J. 427, 430 (1957); *Recent Developments, Criminal Law: Felony-Murder Rule—Felon's Responsibility for Death of Accomplice*, 65 Colum. L. Rev. 1496 (1965).

[8] Recent Cases, *Criminal Law-Homicide*, 59 Dickinson L. Rev. 183, 185 (1955); Recent Decisions, *Criminal Law—Murder-Felony Murder Rule*, 9 Duq. L. Rev. 122, 123 (1970).

era si los acusados eran culpables de asesinato o de homicidio. Como no se tomó en consideración la existencia de desgracia (*misadventure*), podemos presumir que el acto de lanzar la piedra no fue una acción descuidada, sino que el siervo que la lanzó tenía, al menos, la intención de golpear, y no de matar, a alguien de la casa de Mansfield.[9] El tribunal, al resolver el caso, se dividió. La mayoría sostuvo que si alguien deliberadamente llevaba a cabo un acto de violencia hacia terceras personas y una persona ajena moría, se trataba de un asesinato independientemente de que hubiese habido una equivocación o un mal uso de la fuerza.[10] La minoría estimó que se trataba de homicidio porque el acto violento no estaba dirigido hacia la persona que murió. Es decir, en *Herbert* estaba envuelto un *acto deliberado de violencia* contra la persona, cuyo resultado fue el que alguien ajeno fuera víctima de dicho acto.

Kaye[11] ha sugerido que una versión incorrecta del caso *Lord Dacres*, repetida por Crompton, dio base al siguiente comentario de Lord Coke:

Si el acto fuere ilegal, se trata de asesinato. Si A, en el intento de robar un ciervo del bosque de B le dispara al ciervo y por una desviación de la flecha mata a un niño que está oculto entre los arbustos, se trata de asesinato porque el acto fue ilegal aunque A no tuvo la intención de herir al niño ni estaba consciente de su presencia.

Pero si B, dueño del bosque, le disparara a sus propios ciervos y sin ninguna mala intención matara al niño al desviarse su flecha, esto sería un homicidio desgraciado, no un crimen.

Es decir, si alguien le dispara a un ave silvestre que se encuentra en un árbol, y su flecha mata, sin ninguna mala intención de su parte, a cualquier criatura razonable que se encuentre lejos del lugar, se trata de un *per infortunium* [desgracia], ya que dispararle al ave silvestre no era un acto

---

(9) Kaye, *op. cit.*, pág. 578.

(10) *Id.*, págs. 581, 586, 589.

(11) *Id.*, pág. 593.

ilegal. Pero si se le hubiese disparado a un gallo o gallina, o a cualquiera ave doméstica perteneciente a otro, y por mala suerte la flecha matara a un hombre, esto sería asesinato, ya que el acto era ilegal. [12]

El anterior fragmento de Coke, junto a los casos de *Lord Dacres* y *Herbert,* se cita frecuentemente como el origen de la doctrina de *felony-murder.* [13] Ha sido criticado como completamente desprovisto de autoridad: "Un comentario histórico revelador sobre la esencial falta de lógica de la regla es aquél hecho por quienes ven su génesis como una equivocación de Coke al traducir e interpretar un pasaje de Bracton." [14] El magistrado inglés Stephen consideró la interpretación de Coke "asombrosa" [15] y "monstruosa". [16] Apunta que el ejemplo usado por Bracton no entra en la categoría de asesinato (*murder*) tal como aquél define el término. [17] Además del pasaje de Bracton, Coke cita tres casos para apoyar su comentario y, sin embargo, "luego de una investigación cuidadosa de las autoridades citadas por Coke", Stephen concluye que la formulación de la regla hecha por Coke "no está justificada por las autoridades que él cita". Al comentar sobre la severidad de la doctrina propuesta por Coke, otro de los primeros comentaristas de la doctrina dijo, "Esta distinción no ha sido establecida por ningún estatuto, sino que es el Derecho común de Sir Edward Coke". [18]

---

[12] Coke, *Third Institutes, 1797, pág. 56.*

[13] 2 Torcia, Wharton's *Criminal Law,* 14ta ed., sec. 145, 204; Hurst, *Criminal Law—The Felony-Murder Doctrine Repudiated,* 36 Ky. L.J. 106 (1947); Moesel, *A Survey of Felony Murder,* 28 Temple L.Q. 453 (1955); 3 Stephen, *A History of the Criminal Law of England,* Londres, Ed. MacMillan, 1883, pág. 57; *Constructive Murder,* 65 The Law Times 291 (1878); 7A Hawaii Rev. Stat., sec. 707-701, Commentary, pág. 345.

[14] *Felon's Responsibility,* supra, n. 2, pág. 1496.

[15] 3 Stephen, *op. cit.,* pág. 57.

[16] *Íd.,* pág. 65.

[17] *Íd.,* pág. 58.

[18] 6 Hobbes, English Works, *Dialogue of the Common Laws,* 86, 87 (1840); Moesel, *op. cit.,* pág. 453.

En su obra *Pleas of the Crown*, Hale se negó a incluir en la doctrina todos los actos ilegales y, en su lugar, dio ejemplos de muertes producidas por actos ilegales, algunas de las cuales eran asesinatos y otras homicidios. [19] Stephen entendió que Hale requería un acto dirigido a causar algún tipo de daño físico o, de lo contrario, la muerte sería considerada homicidio. [20] Y en *Rex* v. *Keate*, Comberbach 406; 90 Eng. Rep. 557 (1697), el Juez Presidente Holt dijo que el comentario de Coke era una propuesta muy exagerada en Derecho y que para que un homicidio no intencional constituyera asesinato debía existir el intento de cometer un delito grave (*felony*) o el propósito de hacerle daño a una persona. [21]

Sobre este extremo el jurista Foster expresó que una muerte no intencional producida por un acto ilegal sería un asesinato si se produjera "en el curso de una intención criminal". [22] Al comentar estas expresiones, Stephen afirmó que "una doctrina es menos mala que la otra, básicamente porque es más limitada". [23] La única autoridad citada por Foster en su comentario es un *dictum* de C. J. Host, en *Rex* v. *Plummer*, Kelyng 109; 84 Eng. Rep. 1103 (1701), el cual a su vez sólo citó a Coke en cuanto al requisito de intención criminal. [24] La posición de Foster ha sido reiterada por Hawkins, Blackstone e East. [25]

La jurisprudencia de la Inglaterra en el siglo XIX refleja los esfuerzos que realizaron los tribunales británi-

---

[19] 1 Hale, *Pleas of the Crown* 465. Véanse además, Perkins, *op. cit.*, pág. 38; y Moreland, *Law of Homicide*, Indianapolis, Bobbs-Merrill, 1952, pág. 42.

[20] 3 Stephen, *op. cit.*, pág. 65.

[21] Véanse además, Wilner, *op. cit.*, pág. 812; y 3 Stephen, *op. cit.*, pág. 69.

[22] Foster, *Crown Law*, 2da ed., 1791, pág. 258. También 3 Stephen, *op. cit.*, pág. 75.

[23] *Íd.*

[24] *Íd.*

[25] 1 Hawkins, *Pleas of the Crown*, 8va ed., 1824, pág. 86; 4 Blackstone, *Commentaries*, Hammond, Ed. 1898, págs. 192, 200–201; 1 East, *Pleas of the Crown*, 1803, págs. 255–260. Véanse además, Moreland, *op. cit.*, pág. 42; Moesel, *op. cit.*, pág. 453; Perkins, *op. cit.*, pág. 559.

cos para restringir la aplicación de la doctrina. *Regina* v. *Greenwood*, 7 Cox, Crim. Cas. 404 (1857); *Regina* v. *Horsey*, 3 F & F 287, 176 Eng. Rep. 129 (1862); culminando en *Regina* v. *Serne*, 16 Cox, Crim. Cas. 311 (1887). En el presente siglo fue invocada comparativamente poco y abolida en 1957.[26] La Sec. 1 de la Ley de Homicidios de Inglaterra (1957, 5 & 6 Eliz. 2, cap. 11, sec. 1), dispone que una muerte ocurrida en situación de *felony-murder* no será asesinato a menos que haya sido llevada a cabo con la malicia y la premeditación requeridas en todos los otros casos de asesinato.

La trayectoria histórica expuesta refleja que el origen de la doctrina es dudoso. En Inglaterra, país donde nace, fue continuamente modificada y restringida, hasta que finalmente fue derogada. Podemos concluir que la misma surgió de una errónea interpretación jurisprudencial. En sus comienzos la validez de la misma no fue cuestionada. Ello respondía al hecho histórico de que para esa época todo delito grave (*felony*) era castigado con la pena capital. Entonces, "no era particularmente importante si el condenado era ahorcado por el delito grave inicial o por la muerte que éste produjo accidentalmente".[27] Por lo tanto, como señalaran Stephen y Perkins, en ese período la aplicación directa de la doctrina no provocó ninguna injusticia.[28]

Otro factor que la favoreció fue que el *Common Law* no reconoce grados de asesinato.[29] Esta circunstancia expe-

---

[26] Prevezer, *The English Homicide Act: a New Attempt to Revise the Law of Murder*, 57 Colum. L. Rev. 624, 635 (1957).

[27] *Commonwealth* v. *Redline*, 391 Pa. 486, 494, 137 A.2d 472, 476 (1958); *Powers* v. *Commonwealth*, 110 Ky. 386, 414, 61 S.W. 735, 741 (1901); 2 Torcia, *op. cit.*, sec. 147, pág. 212; 3 Stephen, *op. cit.*, págs. 75-76; LaFave y Scott, *Criminal Law*, pág. 546; Perkins, *op. cit.*, pág. 44.

[28] Perkins, *op. cit.*, pág. 44.

[29] 1 Wharton, *op. cit.*, sec. 263, pág. 558. Compárese: *The Homicide Act, 1937*, 8 Halsbury, *Statutes of England*, 3ra ed., 1969, sec. 1 *et seq.*

rimentó en los Estados Unidos un gran cambio. En 22 de abril de 1794 Pennsylvania se convirtió en el primer estado que dividió el asesinato en grados, estableciendo a su vez diferencias en la pena.[30] La evidencia recopilada por Keedy indica que su adopción surgió como resultado de la creciente preocupación por el rigor excesivo que implicaba la imposición de la pena de muerte a los convictos de cierto tipo de asesinato.[31] Al aprobarse esta innovadora legislación se incorpora a la misma la doctrina de asesinato estatutario, limitándola a los delitos de incendio, violación, robo y escalamiento.[32] El estatuto de Pennsylvania se ha mantenido inalterado con la única excepción de que en el año 1939 se enmendó para incluir el delito de robo de niños.[33]

En el año 1856 California añadió los términos del Código Penal de Pennsylvania a su propio estatuto. Más tarde, en el 1872, adoptó e incorporó el esquema estatutario de Pennsylvania, definiendo el asesinato en general, tal como lo hacían las reglas del *Common Law*, y dividiéndolo luego en grados.[34] La nueva técnica de dividir en grados los delitos según Pennsylvania y la incorporación de la doctrina del asesinato estatutario a la misma, rápidamente ganó adeptos y se extendió a todas las jurisdicciones en los Estados Unidos.

---

[30] 4 *Journal of the Senate* 242 (Pa. 1794); E. Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder*, 97 U. Pa. L. Rev. 759 (1949).

[31] *Id.* Sobre la posible influencia que los dogmas eclesiásticos de la época hayan podido tener en el establecimiento de distinciones entre delitos y grados de los mismos a base del elusivo criterio del estado de la mente del autor, véase Turner, *The Mental Element in Crimes at Common Law*, 6 Cambridge L.J. 31 (1938), según citado en M. Joseff, *Homicide—Murder—Intent to Kill as Affecting the Degree of Murder*, 24 So. Cal. L. Rev. 288, 289 (1951).

[32] 9 Duq. L. Rev., *supra*, págs. 123–124.

[33] Pa. Stat. Ann., Tít. 18, sec. 4701 (1939).

[34] J. Pike, *What is Second Degree Murder in California?*, 9 So. Cal. L. Rev. 112, 117 (1936); Joseff, *op. cit.*, pág. 290.

## II

*Limitaciones y Perspectiva Moderna de la Doctrina:*

Hemos señalado previamente que el origen de la doctrina es dudoso. Ello ha contribuido a que no haya sido una norma estática y bien definida, caracterizándose su evolución histórica en el Derecho penal por una continua interpretación judicial dirigida a restringir la severidad de su aplicación. Iguales limitaciones se han establecido por mandato legislativo.

Las condiciones elaboradas por los tribunales se basan en que el delito grave (*felony*) cometido o intentado debe ser: (1) peligroso para la vida humana; [35] (2) una consecuencia natural y probable del delito grave (*felony*); [36] (3) la causa próxima de la muerte; [37] (4) *malum in se*; [38] (5) un delito bajo el Derecho común (*common law crime*); [39] (6) interpretado restrictivamente el período durante el cual el delito grave (*felony*) está en proceso de cometerse; [40] y (7) independiente al asesinato. [41]

[35] *People* v. *Pavlic*, 227 Mich. 562, 199 N.W. 373 (1924); *Commonwealth* v. *Bowden*, 456 Pa. 278, 309 A.2d 714 (1973); *Jenkins* v. *State*, 230 A.2d 262 (1967), confirmado en 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969); *State* v. *Moffitt*, 199 Kan. 514, 431 P.2d 879 (1967); *People* v. *Washington*, 62 Cal.2d 777, 44 Cal. Rptr. 442, 402 P.2d 130 (1965); *People* v. *Phillips*, 64 Cal.2d 574, 51 Cal. Rptr. 225, 414 P.2d 353 (1966); *People* v. *Goldvarg*, 346 Ill. 398, 178 N.E. 892 (1931); *State* v. *Thompson*, 280 N.C. 202, 185 S.E.2d 666 (1972); *People* v. *Jeffrey Carter*, 387 Mich. 397, 197 N.W.2d 57 (1972); *Pliemling* v. *State*, 46 Wis. 516, 1 N.W. 278 (1879); *People* v. *Golson*, 32 Ill.2d 398, 207 N.E.2d 68 (1965); *Wade* v. *State*, 581 P.2d 914 (1978).

[36] *Powers* v. *Commonwealth*, supra.

[37] *People* v. *Louis Scott*, 29 Mich. App. 549, 185 N.W.2d 576 (1971); *Wade* v. *State*, supra; *State* v. *Mauldin*, 215 Kan. 956, 958, 529 P.2d 124, 126 (1974); *State* v. *Glover*, 330 Mo. 709, 50 S.W.2d 1049 (1932); *State* v. *Diebold*, 152 Wash. 68, 277 P. 394 (1929); *People* v. *Treichel*, 229 Mich. 303, 200 N.W. 950 (1924); *Jenkins* v. *State*, supra; *State* v. *Moffitt*, supra; *Pliemling* v. *State*, supra; *State* v. *Leopold*, 110 Conn. 55, 147 A. 118 (1929); *Powers* v. *Commonwealth*, supra.

[38] *People* v. *Pavlic*, supra; *People* v. *Samuel Scott*, 6 Mich. 287 (1859).

[39] *Commonwealth* v. *Exler*, 243 Pa. 155, 89 A. 968 (1914); *State* v. *Burrell*, 120 N.J.L. 277, 199 A. 18 (1938).

[40] *People* v. *Archie Smith*, 55 Mich. App. 184, 222 N.W.2d 172 (1974), confirmado en parte en 396 Mich. 825 (1976); *State* v. *Diebold*, supra; *People* v.

La regla al presente no es favorecida por los tribunales y sólo la aplican cuando la ley lo requiere,[42] y en esas instancias lo hacen con renuencia. Siempre que las circunstancias lo permiten moderan su aplicación.

Por otro lado se reconoce que las limitaciones originadas en las legislaturas pueden agruparse en cinco categorías, a saber:

(a) la derogación o eliminación total del ordenamiento jurídico. Este curso de acción lo han seguido sólo tres estados: Hawaii,[43] Kentucky[44] y Ohio.[45]

(b) reducción en el grado del asesinato así cometido. Bajo esta técnica el Poder Legislativo tipifica el asesinato cometido al perpetrarse o intentarse perpetrar un delito grave, no como un asesinato en primer grado, y sí como de un grado menor. Los estados de Alaska,[46] Louisiana,[47] New York,[48] Pennsylvania,[49] y Utah[50] consideran el asesinato cometido bajo esta variante como de segundo

---

*Hüter*, 184 N.Y. 237, 77 N.E. 6 (1906); *People* v. *Walsh*, 262 N.Y. 140, 186 N.E. 422 (1933); *Huggins* v. *State*, 149 Miss. 280, 115 So. 213 (1928); *State* v. *Taylor*, 173 La. 1010, 139 So. 463 (1931); *State* v. *Montgomery*, 191 Neb. 470, 215 N.W.2d 881 (1974); *People* v. *Joyner*, 32 App. Div.2d 260, 301 N.Y.S.2d 215 (1969), revocado en 26 N.Y.2d 106, 257 N.E.2d 26, 308 N.Y.S.2d 840 (1970); *State* v. *Opher*, 38 Del. 93, 188 A. 257 (1936).

[41] *Garrett* v. *State*, 573 S.W.2d 543 (1978); *People* v. *Moran*, 246 N.Y. 100, 158 N.E. 35 (1927); *State* v. *Fisher*, 120 Kan. 226, 243 P. 291 (1926); *State* v. *Severns*, 158 Kan. 453, 148 P.2d 488 (1944); *State* v. *Shock*, 68 Mo. 552 (1878); *People* v. *Hüter*, supra; *People* v. *Ireland*, 70 Cal.2d 522, 450 P.2d 580, 75 Cal. Rptr. 188 (1969); *Application of felony-murder doctrine*, supra; *People* v. *Wilson*, 1 Cal.3d 431, 462 P.2d 22, 82 Cal. Rptr. 494 (1969); *People* v. *Sears*, 2 Cal.3d 180, 465 P.2d 847, 84 Cal. Rptr. 711 (1970).

[42] Perkins, *op. cit.*, pág. 44.

[43] Hawaii Rev. Stat., sec. 707-701.

[44] Ky. Rev. Stat., sec. 507.020.

[45] Ohio Rev. Code Ann., sec. 2903.04 (Page).

[46] Alaska Stat., secs. 11.41.110, 11.41.115.

[47] La. Rev. Stat. Ann., sec. 14:30.1.

[48] N.Y. Penal Law, sec. 125.25 (McKinney).

[49] Pa. Cons. Stat. Ann., tít. 18, sec. 2502 (Purdon).

[50] Utah Code Ann., sec. 76-5-203 (1).

grado. Minnesota, (⁵¹) por su parte, lo califica como asesinato en tercer grado, pero a la misma vez crea ciertas excepciones. Wisconsin, (⁵²) por otro, califica el asesinato así cometido como un delito grave de clase B, estableciéndole una pena máxima de 20 años en prisión.

(c) el requisito de exigir *mens rea*, además de la intención de cometer un delito grave (*felony*). Se requiere que se pruebe la existencia del *mens rea* además de la intención de perpetrar un delito grave para que pueda aplicarse. Entre los estados que se encuentran en esta categoría están Arkansas, (⁵³) Delaware (⁵⁴) y New Hampshire. (⁵⁵)

(d) la enumeración de ciertos delitos graves bajo la regla. En cuanto a esta limitación podemos señalar que es la que mayormente se está utilizando al presente en los diferentes estados de la Unión. Bajo la misma la legislatura establece expresamente que al cometerse o intentarse cometer ciertos delitos específicos, si se causa la muerte a alguna persona, el asesinato se considerará de primer grado. Esta limitación tiene dos efectos: primero, reduce a un número restringido los delitos graves en que se aplica la doctrina, y segundo, en caso de que se cometa un asesinato al perpetrar o intentar perpetrar un delito de los no comprendidos entre los enumerados —para que se califique como asesinato en primer grado— el Estado viene obligado a probar la intención específica de cometer dicho asesinato. El Código Penal Modelo nos señala que en esta categoría se encuentran treinta y una (31) jurisdicciones en los Estados Unidos. (⁵⁶)

---

(⁵¹) Minn. Stat. Ann., secs. 609.185, 609.195.

(⁵²) Wis. Stat. Ann., secs. 940.02 (2), 939.50 (3)(b).

(⁵³) Ark. Stat. Ann., sec. 41.1502.

(⁵⁴) Del. Code, tít. 11, sec. 636.

(⁵⁵) N.H. Rev. Stat. Ann., secs. 630:1, 630:1-a y 630:1-b.

(⁵⁶) Véanse Código Penal Modelo, Draft #9, pág. 33 y 34; Ala. Code, tít. 14, sec. 413 (Michie 1940); Ariz. Rev. Stats. Ann., sec. 13-452 (West 1956); Ark. Stats., sec. 41-2205 (Bobbs-Merrill 1947); Cal. Pen. Code, sec. 189 (Deering 1949);

(e) la disponibilidad de defensas afirmativas. Esta limitación, de reciente cuño, consiste en poner a disposición del acusado ciertas defensas afirmativas, esgrimibles cuando no actúa solo al cometer uno de los delitos señalados en el estatuto. Algunos de los estados que la han establecido son New York, [57] Alaska, [58] Arkansas, [59] Colorado, [60] Connecticut, [61] New Jersey, [62] North Dakota, [63] Oregon, [64] Washington, [65] y Maine. [66]

Cabe mencionar que aun con todas estas cortapisas, los cronistas y comentaristas siguen considerando la doctrina como un vestigio anacrónico. Se aduce que es un sobreviviente histórico cuya existencia carece de lógica y de base práctica en el Derecho moderno. [67] El continuo ataque de que es objeto sigue respondiendo al señalamiento de que la misma quebranta el principio rector en Derecho penal de

Colo. Rev. Stats., sec. 40-2-3 (1953); Conn. Gen. Stats., sec. 782.04 (1957); Ida. Code, sec. 18-4003 (Bobbs-Merrill 1948); Ind. Stat. Ann., sec. 10-3401 (Bobbs-Merrill 1956); Iowa Code Ann., sec. 690.2 (1958); Md. Ann. Code, art. 27, sec. 407–410 (Michie 1957); Mich. Comp' Laws, sec. 750.316 (1948); Mo. Rev. Stats., sec. 559.010 (1949); Mont. Rev. Codes Ann., sec. 94-2503 (Allen Smith 1947); Neb. Rev. Stats., sec. 28-401 (1943); Nev. Rev. Stats., sec. 200.030 (1957); N.H. Rev. Stats. Ann., sec. 585.1 (Lawyer's Coop. 1955); N.J. Stats. Ann., sec. 113-2 (West 1953); N.D. Rev. Code, sec. 12-2712 (1953); Ore. Stats., sec. 163.010 (1953); Pa. Stats. Ann., sec. 4701 (Purdon 1945); R.I. Gen. Laws, sec. 11-23-1 (Bobbs-Merrill 1956); Tenn. Code Ann., sec. 39-2402 (Bobbs-Merrill 1955); Utah Code Ann., sec. 76-30-3 (Allen Smith 1953); Vt. Stats., sec. 8240 (1947); Va. Code, sec. 18-30 (Michie 1950); Wash. Rev. Code, sec. 9.48.030 (1951); W.Va. Code, sec. 5916 (Michie 1955); Wyo. Comp. Stats. Ann., sec. 9-201 (Bobbs-Merrill 1945); D.C. Code, sec. 22-2401 (1951); 18 U.S.C.A. sec. 1111 (1950).

[57] Sec. 125.25 del Código Penal de New York. Véanse además, Comment, 24 Rutgers L. Rev. 591, 612–613, escolio 144 (1970); *People* v. *Aaron*, 299 N.W.2d 304, 316 (1980).

[58] Alaska Stat., *supra.*

[59] Ark. Stat. Ann., *supra.*

[60] Colo. Rev. Stat., sec. 18-3-102.

[61] Conn. Gen. Stat., sec. 53a–54c.

[62] N.J. Rev. Stat. Ann., sec. 2C:11-3(a).

[63] N.D. Cent. Code, sec. 12.1-16-01.

[64] Or. Rev. Stat., sec. 163.115.

[65] Wash. Rev. Code Ann., sec. 9A.32.030.

[66] Me. Rev. Stat., tít. 17-A, sec. 202. Véase además: 40 Am.Jur.2d, sec. 72.

[67] Moreland, *op. cit.*, pág. 82.

*mens rea*, esto es, que ninguna persona es responsable penalmente por haber producido cierto resultado delictivo, si al momento de producirlo no existía un estado mental capaz de producir dicho resultado, o sea la intención específica de producirlo.[68] Adviértase, no obstante, que esa intención criminal (*mens rea*) constituye un estado mental intangible que a menudo se infiere de los actos y circunstancias que lo rodean,[69] que por lo general es elemento esencial del delito.[70]

El Código Penal Modelo, aunque recomienda su abandono, establece en la Sec. 201.2(b) que la muerte será asesinato en primer grado cuando se haya cometido imprudentemente en circunstancias que manifiesten una indiferencia extrema hacia el valor de la vida humana. Establece, además, que se presume la existencia de la imprudencia e indiferencia si el causante está involucrado o es co-autor en la comisión, en el intento de cometer, o en la huida luego de cometer un robo, una violación por medio de la fuerza, amenaza o coacción, un incendio malicioso, un escalamiento, un secuestro o una fuga.[71] Wechsler nos dice que lo que ha hecho el Código Penal Modelo es crear una presunción controvertible de que ha mediado imprudencia y que se ha manifestado una indiferencia extrema hacia el valor de la vida humana, cuando se causa una muerte bajo las condiciones allí enumeradas. Afirma, además, que los que redactaron dicho Código hubieran querido seguir el ejemplo británico y eliminarla, pero se pensó que ese camino sería de poco valor político.[72]

---

[68] Gegan, *Criminal Homicide in the Revised New York Penal Law*, 12 N.Y.L. Forum 565, 586 (1966); Williams, *El Elemento Mental en el Delito*, 27 Rev. Jur. U.P.R. 169 (1957); 9 Duq. L. Rev., *supra*, pág. 122.

[69] *Pueblo* v. *Miranda*, 79 D.P.R. 710, 716 (1956); Hall, *General Principles of Criminal Law*, Indianapolis, Bobbs-Merrill, 147, págs. 279–376.

[70] *Pueblo* v. *Miranda*, supra.

[71] Código Penal Modelo, *op. cit.*, pág. 33.

[72] Wechsler, *Codification of Criminal Law in the United States: The Model Penal Code*, 68 Colum. L. Rev. 1425, 1446–1447 (1968).

## III

*La Doctrina en Puerto Rico:*

Examinado el origen y las limitaciones de la doctrina, estudiemos su evolución en el Derecho puertorriqueño.

### A. *Advenimiento*

Para el año 1822, siendo Puerto Rico colonia de España, comenzó en dicho país una corriente para lograr una reorganización de su legislación penal sobre bases más científicas. Ello originó la aprobación el 17 de julio de 1870 de un Código Penal. El 23 de marzo de 1879, mediante real decreto del gobierno español, se extendió a Cuba y Puerto Rico. Su Art. 414, que tipificaba el delito de asesinato, no admitía la existencia de distintos casos de asesinato, y sólo establecía y regulaba el delito de asesinato como tal. E. Cuello Calón, *Derecho Penal*, 13ra ed., Barcelona, Ed. Bosch, 1972, T. II, vol. 2, pág. 495 *et seq.* Bajo ese Código se puede afirmar que en Puerto Rico no se reconocía la calificación de asesinato en primer y segundo grado. *El Pueblo* v. *Reyes*, 12 D.P.R. 61 (1907). Tampoco existía ni se visualizaba la regla del asesinato estatutario. Tal sigue siendo la situación en España. Cuello Calón, *op. cit.*

Al verificarse el cambio de soberanía en el año 1898, la Orden General Núm. 1 del Gobierno Militar implantado en Puerto Rico, mantuvo vigente dicho Código Penal. Con la creación de la Comisión Codificadora del año 1901, conforme la Sec. 40 de la Ley Foraker,[73] nuestro Derecho penal experimentó un gran cambio. La Comisión recomendó la derogación del vigente Código Penal y la aprobación de uno aparentemente nuevo. El código así propuesto por la Comisión se basó en el de California,[74] que

---

[73] 31 Stat. 86, Cap. 191, 12 de abril de 1900 (Carta Orgánica de 1900, sec. 40).

[74] El ilustre jurista Luis Muñoz Morales criticó que se calcara y presentara "como si fuera una novedad y un progreso en relación con lo existente", con-

databa del año 1873. Luego de ciertos trámites legislativos, el 1 de mayo de 1902 se aprobó esa recomendación empezando a regir el día 1 de julio.

En el Art. 199 del entonces nuevo Código se definió que "[a]sesinato es dar muerte ilegal a un ser humano, con malicia y premeditación". Por su parte, el Art. 201 leía:

> Todo asesinato perpetrado por medio de veneno, acecho, ó tortura, y toda clase de muerte alevosa, deliberada y premeditada, ó cometida al perpetrarse ó intentarse algún incendio de morada, rapto, robo, asalto, ó mutilación, constituye asesinato de primer grado; siendo de segundo grado todos los demás.

Con ambos artículos, equivalentes a los Arts. 187 y 189 del Código Penal californiano, por primera vez en la historia del Derecho penal puertorriqueño se divide el delito de asesinato en grados —primero y segundo, *El Pueblo* v. *Reyes*, supra— y además se introduce una doctrina jurisprudencial extraña en esa época al sistema prevaleciente.

Con el transcurso del tiempo el Código Penal del 1902 fue objeto de un sinnúmero de enmiendas. Se mantuvieron inalterados los artículos sobre asesinato y sus modalidades.

B. *Evolución jurisprudencial*

Marcando el primer pronunciamiento judicial está *El Pueblo* v. *Acosta*, 11 D.P.R. 249, 256 (1906). Se acusó a varios de dar muerte a una persona al perpetrar un escalamiento. En la acusación no se alegó que los acusados actuaron premeditadamente y ello fue levantado en apelación. Dijimos "[c]uando al tratarse de cometer un escalamiento, se ocasiona la muerte á una persona, no es necesario, según la sección 201, alegar que el asesinato fue voluntario, deliberado y alevoso como sostiene el abogado del apelante y de igual modo es innecesario el considerar

---

cluyendo que era "muy inferior en su método y principio científico, al derogado español de 1879." *Compendio de Legislación Puertorriqueña y sus precedentes*, U.P.R. 1948, 120–121.

la falta de que la acusación no hable de alevosía". Ese enfoque es reiterado en *El Pueblo* v. *Rosado*, 17 D.P.R. 441, 449 (1911); *El Pueblo* v. *Alméstico*, 18 D.P.R. 320, 333 (1912); *El Pueblo* v. *Izquierdo*, 25 D.P.R. 382 (1917); *El Pueblo* v. *Matos y Matos*, 26 D.P.R. 586 (1918); y *Pueblo* v. *Olivencia*, 54 D.P.R. 908 (1939). Más reciente, *Pueblo* v. *Palóu*, 80 D.P.R. 364 (1958), ejemplariza la aplicación de la regla.

En *Pueblo* v. *Rodríguez Rivera*, 84 D.P.R. 299, 300 (1961), se imputó un asesinato en primer grado por darse muerte a una persona mientras se cometía un escalamiento. El jurado rindió un veredicto de culpabilidad. En apelación se alegó que "erró la Sala al no definir al jurado lo que constituía el delito de escalamiento ya que se acusó de asesinato en la comisión de dicho delito". Al discutirlo indicamos:

> Esta es una situación, como podrá observarse, en que un ingrediente esencial de un delito lo constituye a la vez la comisión o el intento de cometer, otro delito. En ese caso, la muerte es *a fortiori* asesinato de primer grado, aunque no hubiera prueba separada de deliberación y premeditación. *Pueblo* v. *Palou*, supra, pág. 72.
>
> Lo que es un escalamiento, ingrediente esencial en este caso de primer grado de asesinato, constituye un concepto legal al cual se llega estableciéndose determinados hechos. Era necesario e imprescindible, por lo tanto, que la Sala instruyera al jurado sobre lo que constituye en ley este delito, de modo que el jurado, con la prueba ante sí, determinara si se cometía un delito de escalamiento al darse muerte, y traer el veredicto estatutario de asesinato en primer grado y de ningún otro grado o delito menor comprendido. La instrucción aludida se hacía aún más necesaria considerando que el escalamiento es uno de esos delitos que requieren una *intención específica como cuestión de hecho*, y no le basta la intención general del artículo 12 del Código Penal. Págs. 303–304.

Ordenamos nuevo juicio por no haberse brindado dichas instrucciones.

Estas decisiones ilustran la aplicación de la regla en forma automática. Reconocen el delito de asesinato en primer grado estatutariamente sin considerar para nada la intención del imputado. Básicamente son todos los casos que han surgido en Puerto Rico bajo la norma estatuida en el Código Penal de *1902*. Actualmente dicho código no está en vigor. Fue sustituido mediante la Ley Núm. 115 del 22 de julio de 1974, que en los Arts. 82 y 83 respectivamente, tipifica el delito de asesinato. El Art. 82 define que "[a]sesinato es dar muerte a un ser humano con malicia premeditada", y el 83 establece que "[t]odo asesinato perpetrado por medio de veneno, acecho o tortura, y toda clase de muerte alevosa, deliberada y premeditada, o cometida al perpetrarse o intentarse algún incendio de morada, violación, sodomía, robo, escalamiento, secuestro, estragos, mutilación o fuga constituye asesinato en primer grado, siendo de segundo grado todos los demás".

Los comentarios al calce en ocasión de su aprobación afirman que "[s]e mantiene la regla del 'felony murder', pero en forma más abarcadora que la del anterior Código, ya que se amplia el número de delitos a que se aplica la regla, añadiéndose sodomía, secuestro, estragos o fuga. Conforme a dicha regla, toda muerte ocasionada al perpetrarse o intentarse uno de los delitos graves enumerados, constituiría asesinato en primer grado". *Comentarios al Código Penal*, 36 Rev. C. Abo. P.R. 43 (1975).

Se advierte, pues, que la Asamblea Legislativa, aun ante todas las críticas generadas en contra de la doctrina no sólo la mantuvo, sino que aumentó el número de delitos comprendidos. No podemos decir que la Legislatura no contempló ni evaluó su eliminación. La aprobación del nuevo código fue precedida por la redacción, estudios y consideración de varios proyectos. El preparado por el jurista Dr. Francisco Pagán Rodríguez, en sus Arts. 107, 108 y 109, tipificaba el delito de asesinato, pero daba de

baja la regla.[75] Otro, el del Dr. José Miró Cardona regulaba el delito de asesinato en su Art. 86 pero igualmente descartaba dicha regla.[76]

Es inevitable concluir que el Poder Legislativo prescindió de toda recomendación tendiente a excluir la referida doctrina. Es razonable determinar que el fundamento que movió a ese foro a adoptar tal postura fue el enunciado por Holmes: ". . . [s]i la experiencia demuestra, o el legislador entiende que demuestra, que de alguna manera las muertes que, de acuerdo a la evidencia, son accidentales ocurren con desproporcionada frecuencia en conexión con otros delitos, o con resistencia ofrecida a oficiales del orden público, o si en base a la política pública se entiende que es necesario llevar a cabo esfuerzos especiales para prevenir esas muertes, el legislador puede siempre considerar que actos que, en ciertas circunstancias, son criminales o constituyen resistencia a oficiales del orden público, tienen una tendencia suficientemente peligrosa como para ubicarlos bajo una prohibición especial. Es por esto que la ley puede achacar al autor del peligro no sólo las consecuencias que éste puede prever, sino también aquellas que, aunque no pueden predecirse a base de la experiencia ordinaria, puedan ser percibidas por el legislador."[77] Resumiendo, su mantenimiento responde a una política pública gubernamental.

Es con esta perspectiva en mente que rechazamos la exhortación de los apelantes a que sigamos la corriente del estado de Michigan, donde su Tribunal Supremo la eliminó en *People* v. *Aaron*, 299 N.W.2d 304 (1980). Allí la doctrina fue suprimida *porque había sido creada por los tribunales*. Esa situación no existe ni se da en Puerto

---

[75] Rev. Jur. U. I., Núm. 6, pág. 94 (1971).

[76] 41 Rev. Jur. U.P.R. 748–749 (1972).

[77] Holmes, *The Common Law*, págs. 58–59. Código Penal Modelo, *op. cit.*, pág. 38.

Rico. (⁷⁸) Aquí estamos ante una disposición de ley establecida mediante acción legislativa en función al principio de legalidad. (⁷⁹) Su derogación, en ausencia de violación constitucional, corresponde al Poder Legislativo y no al Judicial. En este sentido, los apelantes no han señalado fundamento válido a nivel constitucional en contra de la doctrina. Los casos más recientes del Tribunal Supremo de los Estados Unidos la han aplicado sin reparo alguno. *Whalen* v. *United States*, 445 U.S. 684, 63 L.Ed.2d 715 (1980); *Harris* v. *Oklahoma*, 433 U.S. 682 (1977), y *Lockett* v. *Ohio*, 438 U.S. 586 (1978). Nuestra misión se limita a interpretarla, tratando de lograr un adecuado balance entre los derechos del acusado y los intereses del Estado.

### C. El robo en el asesinato estatutario

Los hechos reseñados previamente demuestran indubitadamente que las muertes ocurrieron al efectuarse un robo. El robo constituye una de las figuras más graves contra la propiedad, pues no sólo integra una ofensa a este derecho, sino que además supone un ataque a la tranquilidad personal individual. Siempre ha sido castigado con graves penas, indicativo de una constante repulsa contra tales hechos. (⁸⁰) Al consumarse un robo, el autor lo efectúa violentando ante todo el sentimiento de piedad en dos vertientes dinámicas: por su efecto contra el robado y subsiguientemente el de propiedad. (⁸¹) El Art. 173 tipifica el

---

(⁷⁸) En esta jurisdicción tan solo existen los delitos estatutarios y no los delitos reconocidos por el *common law* (*common law crimes*). *Corretjer* v. *Tribl. de Distrito*, 72 D.P.R. 754 (1951); *Pueblo* v. *Escambrón Beach Club*, 63 D.P.R. 761 (1944); *El Pueblo* v. *Alcaide*, 29 D.P.R. 184 (1921); *El Pueblo* v. *Ruiz*, 29 D.P.R. 74 (1921); *El Pueblo* v. *Llauger*, 14 D.P.R. 548 (1908).

(⁷⁹) El principio de legalidad establece que "[n]o se instará acción penal contra persona alguna por un hecho que no esté expresamente definido por la ley como delito, ni se impondrán penas o medidas de seguridad que la ley no hubiere previamente establecido". Además que "[n]o se podrán crear por analogía delitos, penas, ni medidas de seguridad". 33 L.P.R.A. sec. 3031.

(⁸⁰) F. Puig Peña, *Derecho Penal*, 5ta ed., Barcelona, Ed. Desco, 1960, T. IV, Vol. 2, pág. 186.

(⁸¹) A. Quintana Ripollés, *Curso de Derecho Penal*, Madrid, Ed. Rev. de Derecho Privado, 1963, vol. 2, pág. 206.

delito de robo: "[t]oda persona que se apropiare ilegalmente de bienes muebles pertenecientes a otra, ya sustrayéndolos de su persona, o de la persona en cuya posesión se encuentren, ya en su inmediata presencia y contra su voluntad, por medio de la violencia o de la intimidación, será sancionada con pena de reclusión por un término mínimo de un año y máximo de veinte años." 33 L.P.R.A. sec. 4279.

■■■ Notamos, pues, cómo son elementos indispensables la intimidación o violencia hacia alguna persona. El vocablo "violencia", según utilizado, significa un acometimiento personal, o sea, un empleo de fuerza física. La "intimidación", por su parte, es la presión moral que por miedo se ejerce sobre el ánimo para conseguir de una persona un objeto determinado. Al concurrir cualquiera de estas dos situaciones —indispensables para que pueda perpetrarse un robo— es de esperarse que la víctima sea expuesta a un grave riesgo o peligro de perder la vida o sufrir grave daño corporal. Por tanto, es razonable concluir que el robo *como tal es un delito muy peligroso para la vida humana.* 50 A.L.R.3d 397, 412, y 40 A.L.R.3d 1341; *People* v. *Stamp*, 2 Cal.App.3d 203, 82 Cal. Rptr. 598 (1969), *cert.* den. 400 U.S. 819 (1970); *People* v. *Brunt*, 24 Cal.App.3d 945, 101 Cal. Rptr. 457 (1972); *People* v. *Lilliock*, 265 Cal.App.2d 419, 71 Cal. Rptr. 434 (1968); *People* v. *Washington*, 62 Cal.2d 777, 44 Cal. Rptr. 442, 402 P.2d 130 (1965).

■■ Siendo el delito de robo uno de tipo grave y extremadamente peligroso para la vida humana, la Legislatura válidamente puede incluirlo bajo la doctrina del asesinato estatutario. El sentido común nos dice que al efectuarse un robo, en que de ordinario los asaltantes utilizan armas de fuego o letales para producir la intimidación, es de esperarse que debido a lo desprevenido de las víctimas y la fluidez situacional éstas puedan resultar lastimadas. Si por el contrario se hace uso de la fuerza física

para consumarlo, la situación empeora. No es necesario mucho esfuerzo mental para comprender que al efectuarse un robo —debido al interés natural de la víctima de proteger su persona y bienes— el asaltante razonablemente ha previsto o puede prever que la consecuencia natural o probable de su acción puede desembocar en la muerte de alguna persona. Art. 15 del Código Penal, 33 L.P.R.A. sec. 3062.

█ Así ocurre en el caso de autos. Los apelantes cometieron los asesinatos imputados en forma intencional. Es norma general que toda persona ha de considerarse que contempla y es responsable por todas las consecuencias naturales de sus propios actos. *Pueblo* v. *González Ruiz*, 90 D.P.R. 580 (1964).

Para fines ilustrativos en Derecho comparado, someramente cabe señalar que las muertes ocurridas al perpetrarse robos, en España, al igual que en otros lugares han sido de gran preocupación. Allá, donde no se admite la doctrina, se ha establecido el delito de robo acompañado de homicidio. Art. 501(1) del Código Penal español. Se comete cuando con motivo o con ocasión del robo resulta un homicidio. [82]

---

[82] Cuello Calón nos dice que "Para la existencia de este delito deben concurrir dos condiciones: 1a. que se cometa un robo; y 2a. que con motivo u ocasión del robo resulte homicidio. En el robo, el propósito de robar, es su elemento primordial. Es preciso la apropiación de una cosa mueble ajena y el ánimo de lucro. El valor de lo robado carece aquí de importancia, incluso para la determinación de la pena, pues el delito existe por muy escaso que sea el valor de la cosa robada.

"El homicidio ha de resultar con motivo u ocasión del robo. Basta que entre aquél exista una relación meramente ocasional. No se requiere que el homicidio se cometa como medio de ejecución del robo, ni que el culpable tenga intención de matar. El delito existe según constante jurisprudencia, aún cuando no concurra ánimo homicida, incluso si la muerte sobreviniere por mero accidente siempre que se produzca con motivo o con ocasión del robo, siendo indiferente que la muerte sea anterior, coetánea o posterior a éste. Es indiferente que el hecho de muerte constituya un homicidio en sentido estricto (Art. 407) o un asesinato (Art. 406)". *Derecho Penal*, 13ra ed., Barcelona, Ed. Bosch, 1972, pág. 858. La figura delictiva del robo con homicidio, como delito complejo, es extraña a la mayoría de los códigos. Sin embargo un importante número de legislaciones his-

D. *Los asesinatos como consecuencia del robo*

Es norma generalmente reconocida que para que un daño o resultado delictivo pueda imputarse a una persona es necesario que el mismo haya ocurrido como consecuencia de su acción u omisión, o sea, que haya una relación de causa y efecto entre el acto y el daño. *Pueblo* v. *Santiago Cedeño*, 106 D.P.R. 663 (1978); *Pueblo* v. *González Ruiz*, supra, págs. 583–585; *Betancourt Rojas* v. *Tribunal Superior*, 90 D.P.R. 747, 758 (1964); *Pueblo* v. *Márquez*, 49 D.P.R. 890 (1936).

La causalidad, como se ha dicho en Italia, es "una salvaguarda del ciudadano . . . contra toda extensión arbitraria de la norma penal". Corte Italiana de Casación, sec. 1, 23 de enero de 1966. Silving, por su parte, nos dice que "es un standard [medida] de limitación de responsabilidad, que opera porporcionando un principio de selección entre varias personas cuya intención y conducta se dirigen hacia un resultado dado cuando tal resultado se produce en los hechos, principio que permite elegir a una de esas personas como objeto de la sanción. La razón para seleccionar como tal objeto al imputado que 'causó' el resultado es que su conexión con este último es más estrecha que la de los otros, aunque la intención de éstos puede haber sido más intensa que la de aquél y su conducta quizás, externamente más directa". H. Silving, *Elementos Constitutivos del Delito*, Ed. U.P.R., 1977, págs. 97–98. Véanse además, P. K. Ryu, *Causation in Criminal Law*, 106 U. Pa. L. Rev. 773, 797–798 (1958); F. Díaz Palos, *La causalidad material en el delito*, Barcelona, Ed. Bosch, 1953; R. Maurach, *Tratado de Derecho Penal*, Barcelona, Ed. Ariel. 1962, págs. 220–247.

En el presente caso, la prueba testifical desfilada en el tribunal de instancia demuestra fuera de toda duda razo-

panoamericanas lo configuran así. Entre ellas se hallan Chile, Art. 433 (1); Argentina, Art. 165; Honduras, Art. 499 (1); Cuba, Art. 517 (1); Costa Rica, Art. 270 (1); Salvador, Art. 457; y Filipinas, Art. 294.

nable que las muertes ocurrieron como consecuencia del robo perpetrado. Varios testigos declararon que Secundino y Benigno, después de las detonaciones, salieron corriendo del negocio, portando el primero una escopeta recortada y el segundo un revólver ensangrentado. Además, que al momento del arresto Benigno tenía las manos bañadas en sangre y que al ellos entrar al establecimiento encontraron dos cadáveres y la caja registradora abierta. *State* v. *Glover*, 330 Mo. 709, 50 S.W.2d 1049 (1932); *State* v. *Darchuck*, 117 Mont. 15, 156 P.2d 173 (1945); *State* v. *Schaeffer*, 96 Ohio 215, 117 N.E. 220 (1917) y 87 A.L.R. 400.

E. *Responsabilidad del apelante Lucret Quiñones, arrestado antes de ocurrir las muertes*

Resta examinar si el apelante Lucret Quiñones es responsable por los delitos de asesinato, aun cuando al momento en que ocurrieron se encontraba arrestado y amarrado por los ciudadanos que se congregaron frente al negocio asaltado.

El Art. 35 del Código Penal, 33 L.P.R.A. sec. 3172, estima autores de un delito, entre otros, a los que toman parte directa en la comisión del delito y a los que cooperan de cualquier otro modo en la comisión del mismo. *Pueblo* v. *Santos Ortiz*, 104 D.P.R. 115 (1975). No hay la menor duda de que la persona que al efectuarse un robo permanece en el auto, con el motor encendido para poder huir inmediatamente cuando los otros lo terminen, es autor de dicho delito. Ahora bien, se ha considerado que bajo ciertas circunstancias un co-autor de un delito de los comprendidos bajo la doctrina de asesinato estatutario, al ser arrestado con anterioridad al momento en que ocurre, no es responsable por dicho asesinato.

Se ha reconocido que para que el arresto de un co-partícipe de un delito pueda levantarse como defensa ante una acusación por asesinato, ocurrido con posterio-

ridad a dicho arresto por los otros co-partícipes del delito original, tienen que concurrir ciertas circunstancias: (a) es indispensable que transcurra un intervalo razonable entre el arresto del co-autor del delito principal y el momento en que los otros co-autores cometen el asesinato —*People* v. *Nichols*, 230 N.Y. 221, 129 N.E. 883 (1921); *People* v. *Schader*, 44 Cal. Rptr. 1930, 401 P.2d 665 (1965); *People* v. *Ford*, 52 Cal. Rptr. 228, 416 P.2d 132 (1966); (b) el lapso de tiempo tiene que ser suficiente como para que los otros co-autores del delito original tengan la oportunidad de comprender que el otro co-partícipe ya no les está prestando apoyo y protección —no necesariamente tienen que saber que ha sido arrestado; (c) además, el período de tiempo no puede ser uno en donde el asesinato sea un acto inminente y la evitación del mismo sea impracticable —*State* v. *Klein*, 97 Conn. 321, 116 A. 596 (1922); *People* v. *Nichols*, supra; *People* v. *Chapman*, 224 N.Y. 463; 121 N.E. 381 (1918); (d) que después de haber sido arrestado el co-autor del delito principal, éste de ninguna manera incite o estimule a sus otros co-autores en la comisión del asesinato —2 Hale, *Pleas of Crown* 464 (1847); y (e) que el co-autor del delito principal que fue arrestado, no actúe para proteger a los otros co-autores para que éstos no sean interrumpidos en la comisión del delito principal. N. Morris, *The Felon's Responsibility for the Lethal Acts of Others*, 105 U. Pa. L. Rev. 50, 74–78 (1956).

En el presente caso el apelante Lucret Quiñones fue arrestado instantes antes de que se efectuaran los disparos que causaron la muerte a las dos personas. Además, cuando los dos co-autores salieron del establecimiento robado, esperaban que Lucret estuviera en el auto para iniciar la huida. Finalmente, cuando éste fue arrestado, ya los asesinatos eran actos inminentes, casi imposibles de evitarse.

Resolvemos que Lucret no puede escapar de su responsabilidad por el delito de asesinato, por el sólo hecho

de haber sido detenido con anterioridad a que se perpetraran. ([83]) Sabía de la existencia de las armas, que sus compañeros las portaban y que el robo se llevaría a cabo utilizándolas para amenazar e intimidar a las víctimas. Conocía que ellos no vacilarían en utilizarlas conforme el disparo hecho en el primer negocio asaltado.

*Se dictará sentencia que confirme las sentencias apeladas.*

---

([83]) No estamos ante un caso en que sea aplicable la defensa de "desistimiento voluntario" consagrada en el Art. 28 del Código Penal. 33 L.P.R.A. sec. 3123. Lucret no abandonó espontánea ni por su propio albedrío la empresa criminal planeada previamente, como tampoco evitó sus resultados, en particular el uso mortal de las armas de fuego por sus compañeros, máxime conociendo la inclinación de éstos usarlas, según hicieron en el primer asalto, el de la ferretería. El desistimiento que exonera por acciones ejecutadas subsiguientemente es el nacido de la voluntad de la persona y "no el impuesto por circunstancias independientes de su libre determinación, aunque hayan influído en ésta". *Comentarios al Código Penal, op. cit.,* pág. 43.