EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico | |
| --- | --- |
| Recurrido | Certiorari |
| v. | 2013 TSPR 130 |
| En Interés del Menor E.S.M.R. | 189 DPR ____ |
| Peticionario | |

Número del Caso: CC-2012-115


Fecha: 6 de noviembre de 2013


Tribunal de Apelaciones:

    Región Judicial de Carolina


Abogada de la Parte Peticionaria:

    Lcda. Zinia I. Acevedo Sánchez


Oficina de la Procuradora General:

    Lcda. Jeanette M. Collazo Ortiz
    Subprocuradora General

    Lcda. Eva Soto Castillo
    Procurador General Auxiliar


Materia: Derecho Penal – Los elementos del delito del asesinato estatutario.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

        v.                           CC-2012-0115      Certiorari

En Interés del Menor
E.S.M.R.

    Peticionario

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 6 de noviembre de 2013.

Este caso nos brinda la oportunidad de interpretar, por primera vez, la figura del "felony murder rule" conforme su redacción en el Art. 106 del Código Penal de Puerto Rico de 2004.[1] Particularmente, debemos analizar cuáles son los elementos necesarios para que se configure esta modalidad de asesinato.

Aunque el Código Penal de 2004 fue derogado por la Ley Núm. 146-2012, el análisis que realizamos hoy es de aplicación a casos similares cuyos hechos hayan sido cometidos durante su

---

[1] 33 L.P.R.A. sec. 4734 (2010).

vigencia. Analizada la controversia, se modifica la determinación del foro apelativo intermedio. Veamos por qué.

I

Los hechos que originan la controversia de epígrafe se remontan al sábado, 26 de junio de 2010, cuando en horas de la mañana, el Sr. Roberto "Cuqui" Rodríguez Mojica, hoy occiso, realizaba trabajos de mecánica en una guagua Ford 350 estacionada en su residencia. Al igual que el señor Rodríguez Mojica, su sobrino, el Sr. Danny Rodríguez Márquez, hacía trabajos de mecánica en una residencia ubicada frente a la de su tío. Mientras trabajaba en su auto, el señor Rodríguez Márquez observó en varias ocasiones al menor E.S.M.R. transitar en una motora por la calle. Minutos después, el señor Rodríguez Mojica encontró en los predios de su residencia al menor E.S.M.R mientras este intentaba apropiarse ilegalmente de su propiedad. Acto seguido, el señor Rodríguez Mojica le propinó un golpe en la parte posterior de la cabeza, que provocó un forcejeo entre ambos. Finalmente, el altercado culminó cuando el menor E.S.M.R. huyó del lugar y se lanzó por un pastizal aledaño.

Luego, el señor Rodríguez Mojica llamó a su sobrino para que fuera a su residencia. Así lo hizo el señor Rodríguez Márquez, quien al llegar encontró la motora del menor E.S.M.R. tirada en el suelo y a su tío recostado de

la guagua Ford 350 "sumamente alterado".[2] A preguntas del sobrino, que no sabía de lo sucedido, el señor Rodríguez Mojica expresó, "el cabroncito de [E.S.M.R.] se me metió a robar, le di un cantazo con algo por la cabeza, no s[é] con que fue y se me tiró por el monte por ahí pa abajo" (…) "vete y búscalo".[3] En atención a la orden de su tío, el señor Rodríguez Márquez se dirigió al pastizal por donde huyó el menor E.S.M.R. para tratar de encontrarlo. Transcurridos aproximadamente 25 minutos, el señor Rodríguez Márquez regresó a la residencia de su tío y encontró a este último tirado en el piso "boca abajo, con un golpe en la cabeza y morado".[4]

Rápidamente, el señor Rodríguez Márquez buscó ayuda de otros familiares, quienes intentaron revivir al señor Rodríguez Mojica. Al ver que no respondía, lo llevaron al hospital, donde esa misma tarde se certificó su muerte. Posteriormente, el Instituto de Ciencias Forenses realizó la autopsia del cuerpo. Del análisis realizado, se determinó que la causa de la muerte fue homicidio por ataque al corazón ("homicide by heart attack").[5] En los hallazgos de la autopsia, la patóloga forense detalló que al momento de la muerte, el corazón del señor

---

[2] Alegato del Peticionario, pág. 3

[3] Transcripción de la prueba oral, pág. 7.

[4] Íd. pág. 8.

[5] Alegato del Peticionario, pág. 5.

Rodríguez Mojica tenía un tamaño más grande de lo normal. Además, el señor Rodríguez Mojica padecía serias complicaciones de salud, principalmente del sistema cardiaco. Según los expertos, todos esos padecimientos, sumados a un fuerte estresor emocional, provocaron la muerte del señor Rodríguez Mojica.

Por estos hechos, el 27 de junio de 2010 se sometió una queja contra el menor E.S.M.R. En ella se le imputó la falta de escalamiento agravado.[6] Luego de celebrada la vista, la Sala de Menores del Tribunal de Primera Instancia determinó causa probable para la aprehensión del menor. El 1 de julio de 2010 se celebró la vista de causa para la presentación de la querella. Una vez finalizada, se determinó causa probable contra el menor E.S.M.R. por la falta de escalamiento agravado. Por los mismos hechos, el 15 de julio de 2010 se sometió una queja adicional contra el menor E.S.M.R., en la cual se le imputó la falta de asesinato estatutario.[7] El 16 de agosto de 2010 se celebró la vista de causa para la presentación de la querella y allí se determinó causa probable por la falta de asesinato estatutario.

Posteriormente, el 15 de noviembre de 2010, el 3 y el 17 de diciembre del mismo año se celebraron vistas adjudicativas en las que se dilucidaron las faltas

---

[6] Art. 204 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4832 (2010).

[7] Art. 106 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4734 (2010).

imputadas. Tras su culminación, se determinó que el menor E.S.M.R. incurrió en las faltas imputadas, por lo que se le impuso una medida dispositiva de 18 meses por la de escalamiento agravado y 36 meses por la de asesinato estatutario, a cumplirse concurrentemente.

Inconforme con la determinación de la Sala de Menores del Tribunal de Primera Instancia, el 14 de enero de 2011 el menor E.S.M.R. apeló al Tribunal de Apelaciones. Mediante Sentencia de 11 de enero de 2012, el foro apelativo intermedio confirmó, en todos sus extremos, al Tribunal de Primera Instancia. En lo relativo al asesinato estatutario, expresó que bajo esta figura "[p]oco importa si la aludida muerte fue ocasionada intencional o incidentalmente".[8] El 15 de enero de 2012 el menor E.S.M.R. presentó una solicitud de reconsideración, que fue declarada no ha lugar el 30 de enero de 2012.

Aún inconforme, el 14 de febrero de 2012 el menor E.S.M.R presentó ante nosotros una Petición de *certiorari*. En la cual, entre otros errores, imputó al Tribunal de Apelaciones haber errado **al negarse a reconsiderar su sentencia, a los fines de resolver si la prueba presentada establece el elemento de intención requerido por el artículo 106(b) del Código Penal de 2004.**

---

[8] Petición de Certiorari, pág. 118.

El 25 de mayo de 2012 expedimos el auto. Con el beneficio de las comparecencias de las partes, estamos en posición de resolver.

## II

El delito de asesinato estatutario surge del "common law" como consecuencia de una fuerte política pública para disuadir y penalizar con mayor severidad a las personas que durante la comisión de los llamados "delitos base" producen la muerte a un ser humano. De esta forma, el legislador identificó aquellos delitos que entendió debían conllevar una pena más rigurosa de ocurrir la muerte de una persona en su consumación o tentativa por estar rodeados de una alta peligrosidad. Originalmente, la incorporación de la doctrina de asesinato estatutario obedeció al problema que confrontaba el Estado para probar el elemento de premeditación requerido en el delito de asesinato en primer grado. Así, al codificar el asesinato estatutario, el Estado solamente venía obligado a demostrar que se cometió o intentó cometer el delito base y que como consecuencia de ello, se produjo una muerte.[9]

Desde su incorporación al derecho penal en nuestra jurisdicción hubo cambios en cuanto a los delitos base que el legislador entendió servían para merecer una pena

---

[9] Véase, Manuel Gómez Guerrero, _El efecto del cambio en la redacción del asesinato estatutario_, 47 Rev. Der P.R. 227, 230-231 (2008).

más extrema a toda muerte que ocurriera en la consumación o tentativa de éstos. Sin embargo, los detractores del asesinato estatutario proponían su derogación por entender que éste dislocaba el proceso, debido a que atentaba contra la presunción de inocencia al cambiar el peso de la prueba en contra del acusado.[10] Esta discusión tuvo lugar al aprobarse el Código Penal del 2004, el cual incorporó un cambio mayor al delito de asesinato estatutario. Ello, debido a que la redacción propuesta cambió el lenguaje utilizado para codificar el asesinato estatutario, teniendo como resultado la eliminación de la doctrina clásica de este tipo de delito.[11] Veamos.

**A. Historial legislativo del Art. 106 del Código Penal de Puerto Rico de 2004, 33 L.P.R.A. sec. 4734 (2010).**

El Código Penal de 1974 precisaba el asesinato estatutario en su inciso (a) al disponer como sigue:

> (a) Todo asesinato perpetrado por medio de veneno, acecho o tortura, **toda clase de muerte** alevosa, deliberada y premeditada, o **cometida al perpetrarse o intentarse algún incendio agravado, violación, sodomía, robo, escalamiento, secuestro, estragos, mutilación o fuga**. (Énfasis suplido.), 33 L.P.R.A. sec. 4002.

De lo expuesto, surgía que cuando la muerte era cometida al perpetrarse o intentarse algún incendio agravado, violación, sodomía, robo, escalamiento, secuestro, estragos, mutilación o fuga, se configuraba la

---

[10] M. Gómez, *supra*

[11] Véase, Ponencia del Lcdo. Luis Ernesto Chiesa Aponte, de 23 de mayo de 2003, sobre la P. del S. 2302, pág. 19.

modalidad de asesinato en primer grado conocida como asesinato estatutario o *felony murder rule.* Éste sólo requería establecer que la causa próxima de la muerte fue la comisión de uno de estos delitos o su tentativa. Por tal razón, no era necesario traer prueba alguna de que el asesinato fue premeditado, deliberado o voluntario, porque se trata de un asesinato en primer grado por imperativo de la ley sin necesidad de probar la deliberación y premeditación.[12] Esto era así porque el elemento de malicia para causar la muerte estaba implícito en el acto de la comisión del delito grave.[13]

Por su parte, el Código Penal de 2004 codificó el delito de asesinato estatutario en el Art. 106, 33 L.P.R.A. sec. 4734, de la siguiente manera:

(a) (…)

(b) Todo **asesinato** que se comete **como consecuencia natural de la consumación o tentativa** de algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago, envenenamiento de las aguas de uso público, agresión grave en su modalidad mutilante, fuga, maltrato intencional o abandono de un menor.

(c) (…)

Toda otra muerte intencional de un ser humano constituye asesinato en segundo grado. (Énfasis suplido.)

Con relación a la doctrina clásica de asesinato estatutario vigente en el Código Penal de 1974, desde

---

[12] Véanse, <u>Pueblo v. Rodríguez Rivera</u>, 84 D.P.R. 299 (1961); <u>Pueblo v. Robles González</u>, 132 D.P.R. 554 (1993).

[13] <u>Pueblo v. Lucret Quiñónez</u>, 111 D.P.R. 716 (1981).

principios de la década de los noventa, la profesora Dora Nevares Muñiz recomendó redefinir el tipo legal de "asesinato" de la siguiente manera:

> **Asesinato en primer grado** (…)
>
> **Asesinato estatutario en primer grado** consiste en dar <u>muerte intencional</u> a un ser humano en ocasión de cometer o intentar cometer alguno de los siguientes delitos graves, incendio agravado, penetración sexual no consentida, robo, escalamiento agravado, secuestro, estragos, agresión grave o fuga. (Énfasis suplido).[14]

Notemos que la profesora Nevares establece que la muerte tiene que ser intencional aunque, contrario a lo que fue finalmente aprobado, la profesora no incluía la necesidad de un nexo causal entre el delito base y la muerte.

Ahora bien, la inclusión del requisito de un nexo causal entre la muerte y el delito base, en unión a la intención de dar muerte, se hace evidente de los <u>Informes Parte Especial Vol. I y II de Estudios Comparados de Códigos Penales de la Comisión de lo Jurídico del Senado de Puerto Rico.</u>[15] En esos informes, la Academia Puertorriqueña de Jurisprudencia y Legislación explicó el

---

[14] <u>Informe de Revisión del Código Penal de Puerto Rico, Vol. II, Capítulos I al X (1991),</u> pág.3.

[15] Informes Parte Especial Vol. I y II de Estudios Comparados de Códigos Penales de la Comisión de lo Jurídico del Senado de Puerto Rico, <u>http://www.ramajudicial.pr/CodigoPenal/acrobat/08-Parte-D-Estudios-Comparados-de-Codigos-Penales-Parte%20E.PDF</u> (última visita el 6 de junio de 2013).

texto del Art. 106 (b). En particular, expresó lo siguiente:

> En la letra (b) se mantiene la figura del asesinato estatutario, pero se incorpora la exigencia de que el asesinato se cometa como **consecuencia natural** de los delitos que se mencionan. Sólo entonces el asesinato aparece como realización de la peligrosidad propia de los delitos enumerados y no como consecuencia al azar. Por otra parte, **se exige que se trata de un verdadero "asesinato",** subsumible en la definición del Artículo anterior: **no cualquier muerte, sino solo la muerte intencional por parte del sujeto**. Otra cosa contradiría la definición del Artículo [105] anterior y la definición "asesinato en primer grado" del presente artículo. (Énfasis suplido).[16]

Por otra parte, durante las vistas públicas para la aprobación del Código Penal de 2004, la Sociedad para la Asistencia Legal (SAL) se expresó en cuanto al anterior Art. 83 del Código Penal de 1974. Al hacerlo, explicó lo siguiente:

> Por muchos años la modalidad del asesinato estatutario ("felony murder") ha estado sujeta a diversos ataques por considerarse, "que es un sobreviviente histórico cuya existencia carece de lógica y de base práctica en el Derecho moderno. El continuo ataque de que es objeto responde al señalamiento de que la misma quebranta el principio rector en el Derecho Penal de **mens rea**, esto es, que ninguna persona es responsable penalmente por haber producido cierto resultado delictivo, si al momento de producirlo no existía un estado mental capaz de

---

[16] Informe de la Comisión de lo Jurídico del Senado de 22 de junio de 2003, página 44, citando a su vez, con la corrección de los números de los artículos, Informes Parte Especial Vol. I y II de Estudios Comparados de Códigos Penales, supra, pág. 12.

producir dicho resultado, o sea la intención específica de producirlo."

(…)

Entendemos que este puede ser el momento propicio para legislar, modificar o en alguna forma cambiar, o modernizar este viejo "vestigio anacrónico" vigente en nuestro Código Penal. Para ello proponemos que en el Artículo 83 se legisle un tercer grado de asesinato que recoja la doctrina del asesinato estatutario vigente, pero que establezca una pena distinta y menos severa para tal delito. No podemos obviar el hecho de que esta clase de asesinato sólo requiere establecer que la causa próxima de la muerte fue la comisión de uno de los delitos incluidos en el tipo legal o su tentativa. No es necesario que el Ministerio fiscal presente prueba alguna dirigida a establecer los elementos del delito de asesinato en primer grado; solamente se requiere que el Estado presente prueba sobre el delito base y sobre el hecho de que ocurrió una muerte. Incluir el asesinato estatutario como otro **"grado"** del delito de asesinato, con penas menos severas, puede ser una alternativa viable para alejarnos de una doctrina que entendemos es injusta e insostenible en el Derecho penal. (Citas en el texto original omitidas y énfasis suplido).[17]

Igual interpretación hizo la profesora Nevares Muñiz cuando comentó que:

Esta clase de asesinato, denominada en inglés *felony murder rule,* se interpretó bajo el Código Penal de 1974, como que sólo requiere establecer que la causa próxima de la muerte fue la comisión de uno de los delitos incluidos en el tipo legal o su tentativa. Bajo los Códigos de 1902 y 1974 no era necesario traer prueba alguna

---

[17] Ponencia del Lcdo. Federico Rentas Rodríguez, Director Ejecutivo de la Sociedad para Asistencia Legal de 22 de abril de 2002 sobre la R. del S. 203, págs. 11-13 http://www.ramajudicial.pr/CodigoPenal/acrobat/29-2003_0524-Sociedad-para-Asistencia-Legal.PDF. (última visita el 6 de junio de 2013.)

de que el asesinato fue premeditado, deliberado y voluntario. Cuando tal era el caso se trataba de un asesinato en primer grado "por fuerza de ley". El elemento mental requerido bajo los Códigos de 1902 y 1974 era el del delito base.

Sin embargo, esta interpretación histórica varía en este nuevo Código. Se han introducido dos cambios. Primero, que se trate de un "verdadero asesinato subsumible en la definición del artículo anterior; no cualquier muerte intencional por parte del sujeto". Esto es, no basta la intención de cometer el delito base, **sino que ahora se requiere intención de causar la muerte**, ya que "asesinato" se define como "dar muerte a un ser humano con intención de causársela".

Segundo, ahora el asesinato estatutario requiere que el asesinato se cometa como consecuencia natural de uno de los delitos base. **No basta que el delito base sea la causa próxima de la muerte**, sino que es necesario que la comisión del delito base, o su tentativa constituya un riesgo considerable y típicamente relevante que se realice en el resultado. La muerte de una persona tiene que ser la consecuencia lógica o natural de la consumación o tentativa del delito base. Como indica el Informe de la Medida, P. del S. 2302, Comisión de lo Jurídico del Senado: "Solo entonces el asesinato aparece como realización de la peligrosidad propia de los delitos enumerados y no como consecuencia al azar" (p.44). (citas en el texto original omitidas).[18]

Por su parte, el profesor Luis Ernesto Chiesa Aponte expresó su preocupación con el texto presentado durante el proceso legislativo del Código Penal de 2004, ya que limitaba el delito de asesinato estatutario a aquellas situaciones en las que la muerte ocurre como

---

[18] D. Nevares-Muñiz, Código Penal de Puerto Rico Actualizado y Comentado, 5ta ed., Instituto para el Desarrollo del Derecho, 2012, págs. 150-151.

consecuencia natural. A esos fines, el profesor Chiesa expresó lo siguiente:

> La primera observación que hay que hacer al delito de asesinato es que la redacción propuesta al eliminar la doctrina clásica del asesinato estatutario ("felony murder"), establece en el inciso (b) del artículo 106 que sólo las muertes que ocurren como consecuencia natural de alguno de los delitos base subyacentes clasificarán para ser consideradas asesinato en primer grado. Esto tiene poco sentido desde un punto de vista de política criminal; debe bastar para que se considere asesinato en primer grado que la muerte se haya producido con dolo eventual (como consecuencia probable del acto y con indiferencia a la producción del resultado lesivo).[19]

Finalmente, y contrario a las recomendaciones de la SAL y del profesor Chiesa Aponte, la Asamblea Legislativa aprobó el Código Penal de 2004 con un delito de asesinato estatutario, el cual **exigía que la muerte haya sido provocada por un asesinato**, entiéndase con intención de causarla, y que además sea como consecuencia natural de la consumación o tentativa del delito base.

Sin embargo, el cambio en el lenguaje causó incertidumbre con relación a si el delito de asesinato estatutario fue erradicado de nuestra normativa. El asunto fue aclarado por este Tribunal en Pueblo v. González Ramos, 165 D.P.R. 675, 709 (2005), expresamos que:

---

[19] Ponencia del Lcdo. Luis Ernesto Chiesa Aponte, de 23 de mayo de 2003, sobre la R. del S. 2302, pág. 19. http://www.ramajudicial.pr/CodigoPenal/acrobat/28-2003_0523-Sr-Luis-Ernesto-Chiesa-Aponte.PDF.(última visita, 6 de junio de 2013.)

> [N]o hay duda de que el asesinato estatutario se mantiene tipificado en el nuevo Código. En otras palabras, la modalidad de asesinato estatutario <u>no</u> ha sido suprimida por el Código Penal de 2004, <u>meramente hubo un cambio en la terminología del delito -Artículo 106- de asesinato estatutario</u>, lo cual, de ninguna forma significa que el asesinato estatutario no se encuentre codificado en el nuevo Código de 2004. (Énfasis en el original).

Hoy hacemos eco de nuestras pasadas expresiones. No obstante, aclaramos que el delito sufrió un cambio trascendental en su redacción, por lo que es nuestra labor interpretar dicho estatuto a la luz de su texto y de la intención del legislador cuando enmendó el artículo.

En este sentido, es importante destacar que el estatuto derogado, el Art. 83 del Código Penal de 1974, *supra*, establecía que el asesinato estatutario aplicaría a "toda muerte". Sin embargo, el Art. 106 del Código Penal de 2004, *supra*, sustituyó la palabra "muerte" por "asesinato". Como podemos observar, la redacción del Art. 106 del Código Penal de 2004, *supra*, exigía que la muerte fuera producto de un <u>"asesinato"</u> y, a su vez, que fuera <u>"consecuencia natural"</u> de la consumación o tentativa de algún delito base. A su vez, el legislador definió el término "asesinato" en el Código Penal de 2004 al definirlo en el Art. 105 como <u>"dar muerte a un ser humano con intención de causársela"</u>, 33 L.P.R.A. sec. 4733 (2010). Ahora bien, no debemos olvidar que el Código Penal de 2004 considera la "intención" como aquella que

surge cuando: (1) el hecho correspondiente ha sido realizado por una conducta dirigida voluntariamente a ejecutarlo (dolo de primer grado); (2) el hecho correspondiente es una consecuencia natural de la conducta voluntaria del autor (dolo de segundo grado); o (3) el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado (dolo eventual). 33 L.P.R.A. sec. 4651.

De acuerdo con ello, y como hemos expresado anteriormente, uno de los fundamentos principales de hermenéutica legal es que siempre "debe describirse y hacerse cumplir la verdadera intención y deseo del poder legislativo". Pueblo v. Zayas Rodríguez, 147 D.P.R. 530, 549 (1999). Así las cosas, no podemos ahora, en el ejercicio de interpretar la ley, ignorar las intenciones que tuvo el legislador al realizar ese cambio transcendental en la redacción del Art. 106 (b) en comparación con el Art. 83 del Código Penal del 1974, 33 L.P.R.A. sec. 4002 (1992).

Lo expuesto deja meridianamente claro que no hay lugar para acusar en situaciones en las cuales ocurre una **muerte casual**, aunque sobrevenga mientras se comete o se intenta cometer uno de los delitos base. Ello, pues el legislador fue claro e intencionalmente plasmó en el Código Penal de 2004 la palabra "asesinato" en sustitución de "muerte". Por tanto, el asesinato, al

requerir intención, tiene que producirse ya sea como consecuencia natural de los actos del sujeto -no por el azar- o cuando su actuación contiene un riesgo conocido y aceptado por el sujeto que decide actuar, es decir, conoce la peligrosidad objetiva de su conducta.[20] Es por ello, que el legislador no realizó cambios al lenguaje utilizado en la parte final del Art. 106 del Código Penal de 2004, en la que hace referencia a "toda otra muerte intencional" para definir el asesinato en segundo grado.

El cambio introducido en el Código Penal de 2004 causó que a tan solo meses de la aprobación del Código Penal de 2004, el 12 de mayo de 2005 la Asamblea Legislativa atendió el P. de la C. 1625.[21] Ese proyecto pretendía enmendar el inciso (b) del Art. 106 del Código Penal de 2004, a los fines de clarificar los elementos del delito de asesinato en primer grado y de la modalidad de asesinato estatutario. En su intento, buscaba introducir la frase "o incidental" y la frase "*irrespectivo de la ausencia de premeditación, deliberación o intención de causarla o de que la persona muerta fuese coautora de los hechos*" en el inciso (b) del

---

[20] Véase, D. Nevares-Muñiz, <u>Nuevo Código Penal de Puerto Rico</u>, Instituto para el Desarrollo del Derecho, Inc., 2005, págs. 31-33.

[21] Cabe señalar que la composición de la Asamblea Legislativa que atendió el P. de la C. 1625 en el 2005 fue sustancialmente distinta a la que aprobó el Código Penal de 2004. Sin embargo, esa Asamblea Legislativa, como la anterior, permitió que el delito de asesinato estatutario se mantuviera como un asesinato consecuencia natural de los actos del sujeto.

mencionado artículo para que leyera de la siguiente
manera:

> (b) Todo asesinato que se comete como
> consecuencia **[natural]** *o incidentalmente en el*
> *transcurso* de la consumación o tentativa de
> algún delito de incendio agravado, agresión
> sexual, robo, escalamiento agravado, secuestro,
> secuestro de un menor, estrago, envenenamiento
> de aguas de uso público, agresión grave en su
> modalidad mutilante, fuga, maltrato intencional
> o abandono de un menor **[.]**, *irrespectivo de la*
> *ausencia de premeditación, deliberación o*
> *intención de causarla o de que la persona muerta*
> *fuese coautora de los hechos.*(énfasis en el
> original).[22]

No obstante, el cambio no fue aprobado por la
mayoría. Sin duda alguna, la intención de la Asamblea
Legislativa al no aprobar el texto propuesto fue que el
delito de asesinato estatutario exigiera que la muerte
fuera un asesinato como consecuencia natural y no un
incidente casual en el transcurso de la consumación o
tentativa del delito.

De la misma forma, el P. de la C. 1625, del 12 de
mayo de 2005, enfatizó que el Art. 106(b) no se refería a
cualquier muerte, sino a un asesinato. Esto es, como
hemos mencionado anteriormente, dar muerte a un ser
humano con intención de causársela. De esta forma, es
claro que el delito de asesinato estatutario exige una
intención mínima de causar muerte a un ser humano.

---

[22] P. de la C. 1625 (2005),
http://www.oslpr.org/files/docs/%7BFFEF4791-8D16-4D42-A28D-
7B0050322540%7D.doc (última visita el 6 de junio de 2013.)

Así las cosas, luego de 4 años y con una Asamblea Legislativa diferente, el 4 de febrero de 2009 la representante Jennifer González Colón propuso nuevamente modificar el Art. 106 mediante el P. de la C. 1036. Este proyecto pretendía enmendar el inciso (b) del Art. 106 del Código Penal de 2004, *supra*, a los fines de clarificar los elementos del delito de asesinato en primer grado y de la modalidad de asesinato estatutario. El proyecto, el cual copiaba la esencia del P. de la C. 1625 de 2005, recibió el voto mayoritario de la Cámara de Representantes, sin embargo no recibió el aval de la Comisión de lo Jurídico Penal del Senado de Puerto Rico. El Senado denegó el P. de la C. 1036, porque al momento de su consideración ya se había aprobado el Código Penal de Puerto Rico de 2012, el cual en esencia acogía las enmiendas propuestas.[23]

---

[23] El Código Penal de 2012, Ley Núm. 146-2012, enmendó sustancialmente la figura del asesinato estatutario en su Art. 93 de la siguiente manera:

Constituye asesinato en primer grado:

 (a) Toda muerte perpetrada por medio de veneno, acecho o tortura, o con premeditación.

    (b) Toda muerte que ocurra al perpetrarse o intentarse algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago (modalidad intencional), envenenamiento de aguas de uso público (modalidad intencional), agresión grave, fuga, maltrato intencional, abandono de un menor; maltrato, maltrato agravado, maltrato mediante restricción de la libertad, o agresión sexual conyugal, según contemplados en la Ley Núm. 54 de 15 de agosto de 1989, según enmendada, conocida como la "Ley para la Protección e Intervención de la Violencia Doméstica".

    (…)

Del análisis antes esbozado, se desprende que la intención de nuestra Asamblea Legislativa era, previo al Código Penal de 2012, sustancialmente diferente a la interpretación que le da el foro apelativo intermedio actualmente, ya que no tan solo cambió la redacción del estatuto, sino que el historial legislativo expresamente recalca que el asesinato estatutario queda reservado para aquellos "asesinatos", conforme a la definición de asesinato contenida en el Código Penal. Si bien en un principio se recomendó adoptar en el Art. 106 del Código Penal de 2004, *supra*, el término "muerte" intencional, esa recomendación fue abandonada oportunamente y sustituida por "asesinato", con todo el rigor que esto implica.

**B. Efecto del Art. 106(b)conforme fue finalmente aprobado en el Código Penal de 2004.**

La peculiaridad del inciso (b) del Art. 106 estriba en que la conducta que típicamente sería catalogada como un asesinato en segundo grado o asesinato atenuado, por vía de este inciso (b), ha de considerarse como asesinato en primer grado con pena de 99 años de reclusión si se comete durante la consumación o tentativa de uno de los delito base. Por lo tanto, no tuvo otro efecto que convertir en **asesinato en primer grado** toda muerte intencional ocurrida "como consecuencia natural" de la

---

Toda otra muerte intencional de un ser humano constituye asesinato en segundo grado. (Énfasis suplido).

comisión de uno de los delitos base incluidos en el propio inciso (b). Por su parte, en casos en los que el imputado sea un menor se exigirán los mismos elementos del delito, pero con las penas establecidas por la Ley Núm. 88 de 9 de julio de 1986, conocida como la Ley de Menores.[24]

Parecería que el propósito fundamental de la figura del asesinato estatutario, según redactado en el Código Penal de 2004, fue persuadir al criminal para que no asesine a sus víctimas mientras comete alguno de los delitos base. Esto, pues, castiga más severamente aquellos **asesinatos** cometidos mientras se comete o intenta cometer ciertos delitos que son inherentemente peligrosos por la vulnerabilidad en la cual se encuentran sus víctimas, por lo que busca protegerlas. El legislador pretendió castigar de forma más severa al delincuente que mientras comete uno de estos delitos asesine a sus víctimas, en contraste con aquellos que únicamente cometen el delito.

Cabe señalar que la acción tomada por nuestra Asamblea Legislativa en el Código Penal del 2004 en relación a esta figura ya había sido adoptada en varias jurisdicciones dentro y fuera de la nación americana. Por ejemplo, Inglaterra[25], cuna de esta figura, derogó el

---

[24] 34 L.P.R.A. sec. 2201.

[25] The English Homicide Act: A New Attempt to Revise the Law of Murder, 57 Colum. L. Rev. 624, 627 (1957).

asesinato estatutario en 1957, y posteriormente estados

de la nación americana como Hawaii[26] y Kentucky[27] han

hecho lo mismo. Otros estados como Alaska[28], Vermont[29],

Michigan[30], New Mexico[31], New Hampshire[32] y Arkansas[33] han

adoptado una doctrina parecida a la de nuestro Código

Penal de 2004, en las cuales requieren que la muerte se

trate de un verdadero asesinato, y más bien la doctrina

es utilizada como un agravante del delito. Otras

jurisdicciones han optado por atender el asunto de las

muertes intencionales durante la consumación o tentativa

---

[26] Hawaii, H.R.S. Sec. 707-701.

[27] Kentucky, KRS Sec. 507.020. The "KRS 507.020 does not preclude the type of conduct described above from constituting murder. It does, however, abandon the doctrine of felony murder as an independent basis for establishing an offense of homicide. (…) Thus, if a defendant intentionally commits an act of killing during a felony his guilt is to be determined under KRS 507.020(1)(a). (…) On the other hand, if the jury should determine that his participation constituted wantonness not manifesting extreme indifference to human life, he is guilty only of manslaughter in the second degree, KRS 507.040." Kentucky Crime Commission/LRC commentary, KRS Sec. 507.020.

[28] Alaska, AS Sec. 11.41.100. "Felony murder" is purposeful killing committed in perpetration of enumerated felonies in first-degree murder statute but, if such purposeful killing is not done in perpetration of one of the enumerated felonies, it may constitute second-degree murder or, if it is done in perpetration of felony but not with specific intent to kill, it may be manslaughter. AS 11.15.010, 11.15.030. Gray v. State, 1970, 463 P.2d.

[29] Vermont, 13 V.S.A. Sec. 2301.

[30] Michigan, M.C.L.A. Sec. 750.316.

[31] New Mexico, N. M. S. A. 1978, Sec. 30-2-1. "Felony-murder statute serves to elevate second-degree murder to first degree when the murder occurs during the commission of a dangerous felony." Campos v. Bravo, 2007, 141 N.M. 801, 161 P.3d 846, rehearing denied.

[32] New Hampshire, N.H. Rev. Stat. Sec. 630:1-a.

[33] Arkansas, A.C.A. Sec. 5-10-102.

de los delitos base como asesinatos estatutarios en primer grado y las que no se cometen con intención atenderlas como un asesinato estatutario de segundo grado. El propósito de los cambios en estas jurisdicciones ha sido atemperar el castigo con los actos intencionales del criminal y de esa manera evitar responsabilizar tan severamente a una persona por las muertes ocurridas durante el acto criminal que no surgen como consecuencia natural de sus actos.

**III**

Al revaluar los hechos de este caso, observamos que el señor Rodríguez Mojica, luego de encontrar al menor E.S.M.R. en los predios de su residencia mientras intentaba apropiarse ilegalmente de su propiedad, sorprendió al joven con un golpe en la cabeza que dio inicio a un forcejeo entre ambos. Ese evento culminó cuando el menor E.S.M.R. logró huir por un pastizal aledaño al lugar. Acto seguido, el señor Rodríguez Mojica llamó a su sobrino, quien por órdenes de su tío salió en busca de E.S.M.R. Pasados aproximadamente 25 minutos del incidente, cuando el señor Rodríguez Márquez regresó de buscar al menor por el pastizal fue que encontró a su tío tirado en el suelo con un golpe en la cabeza y morado. De conformidad con el derecho reseñado, los hechos ocurridos sugieren que el menor E.S.M.R. debe cumplir con la

sentencia por la falta de escalamiento agravado, mas no por el asesinato estatutario.

Del análisis de los hechos resulta evidente que en el caso del peticionario no se cumple con el elemento de intención que requiere el Art. 106 (b). La muerte del señor Rodríguez Mojica no fue un asesinato, por carecer de intención de matar como exige la definición de asesinato en el Código Penal. Por ello, descartamos responsabilizar criminalmente al menor E.S.M.R. por la muerte del señor Rodríguez Mojica, mas no por el acto del escalamiento agravado, de lo cual sí es responsable criminalmente.

## IV

Por todo lo anterior, se modifican las determinaciones de los foros *a quo*, a los efectos de revocar la convicción por el asesinato en primer grado y se devuelve el caso a la Sala de Menores del Tribunal de Primera Instancia para procedimientos ulteriores.

Se dictará Sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

   Recurrido

     v.             CC-2012-115    Certiorari

En Interés del Menor
E.S.M.R.

   Peticionario

SENTENCIA

San Juan, Puerto Rico, a 6 de noviembre de 2013.

Por los fundamentos expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, se modifican las determinaciones de los foros *a quo*, a los efectos de revocar la convicción por el asesinato en primer grado y se devuelve el caso a la Sala de Menores del Tribunal de Primera Instancia para procedimientos ulteriores.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta emite un Voto concurrente al cual se une el Juez Presidente señor Hernández Denton. La Jueza Asociada señora Pabón Charneco no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico
        Recurrido

        v.

En interés del Menor E.S.M.R.
        Peticionario

*Certiorari*

CC-2012-115

Voto concurrente emitido por la Jueza Asociada señora Fiol Matta al cual se une el Juez Presidente señor Hernández Denton

En San Juan, Puerto Rico, a 6 de noviembre de 2013.

Concurro con la Opinión del Tribunal en el presente caso. Ello porque estoy conforme con el resultado al que llega la mayoría de que el asesinato estatutario tipificado en el Código Penal de Puerto Rico de 2004, bajo el cual se resuelve este caso, requería, como elemento mental del delito, la intención de matar. Sin embargo, entiendo que el legislador, al incluir la frase "consecuencia natural" en el artículo 106(b) de ese Código Penal, quiso limitar la naturaleza de la intención exigida para que se configure el delito de asesinato estatutario. La opinión mayoritaria no hizo esa distinción, dejando a mi juicio, un

análisis incompleto de los elementos del delito.

I.

La figura del asesinato estatutario fue introducida a nuestro ordenamiento jurídico a principios del siglo pasado.[33] En su lugar de origen, Inglaterra y en otras jurisdicciones anglosajonas, la doctrina del asesinato estatutario fue modificada y restringida continuamente hasta finalmente ser derogada.[34] En Puerto Rico, luego de varios mandatos legislativos y de limitaciones impuestas por interpretación judicial, el asesinato estatutario se ha mantenido codificado como delito en el sistema jurídico penal.[35]

En términos generales, mediante la figura del asesinato estatutario se sanciona con una pena más severa a aquella persona que produce la muerte de un ser humano al perpetrar o intentar perpetrar uno de ciertos delitos graves especificados por ley.[36] Según se ha desarrollado la

---

[33] Para un análisis de la trayectoria de la doctrina del asesinato estatutario, véase Pueblo v. Lucret Quiñones, 111 D.P.R. 716 (1981).

[34] Pueblo v. Lucret Quiñones, supra, a las págs. 726 y 729. Véase además, la Opinión mayoritaria, a las páginas 22-23.

[35] Art. 201 del Código Penal de Puerto Rico de 1 de mayo de 1902; Art. 83 del Código Penal de del 22 de julio de 1974; Art. 106 del Código Penal de 18 de junio de 2004; Art. 93 del Código Penal de Puerto Rico de 30 de julio de 2012.

[36] Pueblo v. Lucret Quiñones, supra, a las págs. 721; D. Nevares Muñiz, Nuevo Código Penal de Puerto Rico, Instituto

doctrina en Puerto Rico, para que se configure un asesinato en primer grado bajo la modalidad del asesinato estatutario no hay que probar que el acusado actuó con premeditación, deliberación o voluntad de producir la muerte, sino que basta con establecer una relación de causalidad entre el delito grave y la muerte.[37]

Con ello se configura un asesinato en primer grado "por fuerza de ley" al inferirse esa malicia de la mera comisión del delito grave.[38] En el derecho penal moderno, la modalidad, conocida como "causa próxima", ha sido altamente cuestionada, entre otras cosas, por concebir un delito que "quebranta el principio rector… de *mens rea*", o en otras palabras, el principio de "que ninguna persona es responsable penalmente por haber producido cierto resultado delictivo, si al momento de producirlo no existía un estado mental capaz de producir dicho resultado, o la intención específica de producirlo".[39]

No obstante la crítica, la legislatura puertorriqueña mantuvo la figura de asesinato estatutario en los códigos

_____

para el Desarrollo del Derecho, Inc., Puerto Rico, 2005, a las págs. 142-143.

[37] Pueblo v. Rivera Torres, 121 D.P.R. 128, 137-138 (1988). D. Nevares Muñiz, *Nuevo Código Penal de Puerto Rico*, 2005, op. cit., a la pág. 143.

[38] Pueblo v. Rivera Torres, supra, a la pág. 136; Pueblo v. Rodríguez Rivera, 84 D.P.R. 299, 304 (1961).

[39] Pueblo v. Lucret Quiñones, supra, a las págs. 731-732.

penales de 1902 y 1974 bajo esa modalidad; esto como un mecanismo severo para atender la alta incidencia criminal del país.[40] Ahora bien, este Tribunal reconoció que aun cuando la malicia se infiere por mandato de ley, el delito también "exige un criterio sobre causalidad",[41] mediante el cual se entiende que cualquiera de los delitos base genera fácilmente riesgos para la vida de inocentes, que ocurran como consecuencia del mismo.[42] Así pues, se le impone responsabilidad al acusado cuando haya puesto en marcha una sucesión de eventos, al cometer uno de los delitos graves, que "previsiblemente conduzcan a la muerte de un ser humano".[43] La modalidad de "causa próxima" del asesinato estatutario fue sustancialmente modificada en el Código Penal de 2004.

## II.

Mediante la Ley Núm. 149 de 18 de junio de 2004, la Asamblea Legislativa de Puerto Rico promulgó un nuevo Código Penal.[44] El nuevo estatuto incorporó el principio moderno de

---

[40] Pueblo v. Rivera Torres, supra, a la pág. 137; Pueblo v. Calderón Laureano, 113 D.P.R. 574, 578-579 (1982).

[41] Pueblo v. Robles González, 132 D.P.R. 554, 563-564 (1993).

[42] Id. Véase además, Pueblo v. Calderón Laureano, supra, a las págs. 578-579.

[43] Pueblo v. Torres Ramos, 121 D.P.R. 747, 752 (1988).

[44] Exposición de Motivos de la Ley Núm. 149 de 18 de junio de 2004, 33 L.P.R.A sec. 4629 et seq. (2010).

responsabilidad subjetiva que concibe que "nadie p[uede] ser sancionado por un hecho previsto en una ley penal si no lo ha realizado con intención o negligencia".[45] Amparado en el derecho a la dignidad del ser humano, el legislador formuló el principio fundamental del derecho penal moderno en el cual sólo cabe imputar a una persona los hechos que aparecen como obra de su voluntad o que al menos pudo prever y evitar.[46]

Cónsono con dicho principio, el legislador puertorriqueño reformuló los elementos del delito del asesinato estatutario, valorando de distinta manera la conducta punible, con el propósito de disminuir la represión penal. Expresamente, el artículo 106(b) del Código Penal de 2004 dispuso que:

> Constituye asesinato en primer grado: Todo asesinato que se comete como consecuencia natural de la consumación o tentativa de algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago, envenenamiento de aguas de uso público, agresión grave en su modalidad mutilante, fuga, maltrato intencional o abandono de un menor.

El artículo 105 del Código Penal de 2004 definió "asesinato" como "dar muerte a un ser humano con *intención*

---

[45] Art. 22 del Código Penal de 2004, 33 L.P.R.A. sec. 4650 (2010).

[46] D. Nevares Muñiz, *Nuevo Código Penal de Puerto Rico*, 2005, op. cit., a las págs. 31-32.

de causársela".[47] Así, como expresa la Opinión del Tribunal, "el asesinato estatutario qued[ó] reservado para aquellos 'asesinatos', conforme a la definición contenida en el Código Penal".[48] Por tanto, la única interpretación que le podemos dar a la voluntad de nuestra Asamblea Legislativa al aprobar el artículo 106(b) de dicho cuerpo normativo es que, para que se pueda penalizar como asesinato en primer grado una muerte acaecida en la perpetración de uno de los delitos graves o su tentativa, el acusado tiene que haber tenido la intención de causar la muerte. Conforme a ese cambio sustancial, en *Pueblo v. González*, 165 D.P.R. 675 (2005) se cuestionó la existencia de la figura del asesinato estatutario en el Código Penal de 2004. Allí resolvimos que el asesinato estatutario no fue derogado en ese cuerpo legal, sino que se mantuvo vigente, pero incorporando la exigencia de que **el asesinato** se cometiese como **consecuencia natural** de los delitos graves allí identificados.[49]

La frase "consecuencia natural" no es ajena al ordenamiento jurídico penal que estudiamos. Específicamente, el artículo 23 del Código Penal de 2004 define el elemento

---

[47] (Énfasis nuestro) 33 L.P.R.A. sec. 4733 (2010).

[48] Opinión del Tribunal, a la pág. 20.

[49] Pueblo v. González, 165 D.P.R. 675, 709 (2005). En ese caso declinamos definir la frase "consecuencia natural" dispuesta en el artículo 106(b) del Código Penal de 2004 porque los hechos imputados eran penalizados bajo el delito de asesinato estatutario codificado en el Código Penal de 1974.

subjetivo de intención y en su inciso (b) incluye "consecuencia natural" como un modo de intención. El artículo 23 del Código Penal de 2004 dispuso:

> Intención. El delito se considera cometido con intención:
>
> (a)    cuando el hecho correspondiente ha sido realizado por una conducta dirigida voluntariamente a ejecutarlo;
> (b)    el hecho correspondiente es una consecuencia natural de la conducta voluntaria del autor; o
> (c)    cuando el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado.[50]

Los estudiosos del Derecho han definido la intención criminal como algún tipo de querer, por lo que se entiende que "actúa intencionalmente quien 'quiere' realizar el comportamiento prohibido y, además, 'conoce' que junto con su acción concurren las circunstancias concomitantes que establecen la existencia de un delito".[51] Según hemos reconocido, el artículo 23 divide el elemento subjetivo de intención en tres modalidades: propósito, conocimiento, y temeridad.[52] La intención con propósito del inciso (a), admite que "el sujeto tiene como objetivo consciente

---

[50] 33 L.P.R.A. sec. 4651 (2010).

[51]    L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, Publicaciones JTS, Estados Unidos de Norte América, 2007, a la pág. 143.

[52] Pueblo v. Sustache Sustache, 176 D.P.R. 250, 312 (2009). Véase además, L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, op. cit., a la pág. 162.

realizar el acto delictivo, o producir el hecho delictivo".[53]

En cuanto a la naturaleza de la intención que indica el inciso (b), "se entiende que actúa con intención o dolo directo de segundo grado quien ha previsto que la consecuencia necesaria o natural de su conducta es la realización del hecho delictivo".[54] Se conoce también como la modalidad de intención por conocimiento que provee que el sujeto "actúa 'a sabiendas' de que mediante su conducta seguramente cometerá los elementos de un tipo penal".[55] Según lo ha señalado el profesor Chiesa Aponte:

> No es suficiente que el autor esté consciente de que existe alguna probabilidad de que su acción produzca el hecho delictivo para que se considere que actuó "con conocimiento". Se requiere, además, que el actor haya previsto que existía una **alta** probabilidad de que se realizara la conducta prohibida.[56]

Cónsono con lo anterior, el modo de intención del inciso (b) del artículo 23 exige que el sujeto conozca que la producción del hecho delictivo es prácticamente segura y que el riesgo que crea con su conducta supone una alta

---

[53] L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, op. cit., a la pág. 144.

[54] Pueblo v. Sustache Sustache, supra, a la pág. 312; L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, op. cit., a la pág. 146.

[55] L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, op. cit., a las págs. 146 y 160.

[56] (Énfasis en el original) Id., a las págs. 146-147.

probabilidad de producir el hecho delictivo.[57] La conducta voluntaria del autor "no tiene como objetivo consciente la comisión del delito", pero admite como seguro que su actuación dará lugar al delito.[58]

En cuanto a la intención definida en el inciso (c) del artículo 23 o la modalidad de intención por temeridad, el profesor Chiesa Aponte señala que se entiende que el sujeto actúa intencionalmente porque tiene conciencia de que su conducta "implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado".[59] Para determinar si el riesgo creado fue injustificado es necesario tomar en consideración la magnitud del riesgo y si las razones que tenía el autor para crear el riesgo son consideradas no permitidas por la sociedad.[60]

El elemento mental constituye una cuestión de hecho a ser evaluada por el juzgador de los hechos a base las circunstancias relacionadas con el delito y la conducta del

---

[57] Pueblo v. Rivera Cuevas, 181 D.P.R. 699, 712 (2011); L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, op. cit., a la pág. 163.

[58] D. Nevares Muñiz, *Nuevo Código Penal de Puerto Rico*, 2005, op. cit., a la pág. 35; L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, op. cit., a la pág. 147.

[59] L.E. Chiesa Aponte, *Derecho Penal Sustantivo*, op. cit., a las págs. 160-161.

[60] Id. Véase además, D. Nevares Muñiz, *Código Penal de Puerto Rico*, Instituto para el Desarrollo del Derecho, Inc., San Juan, 2013, a la pág. 45.

imputado. Por lo general, por ser una cuestión subjetiva, los tribunales deberán inferir el estado anímico que reflejen las manifestaciones del imputado.[61]

La Academia Puertorriqueña de Jurisprudencia y Legislación, en su ponencia ante el Senado sobre el asesinato estatutario explicó que:

> En la letra B)[62] se mantiene la figura del asesinato estatutario, pero se incorpora la exigencia de que el asesinato se cometa como consecuencia natural de los delitos que se mencionan. Sólo entonces el asesinato aparece como realización de la peligrosidad propia de los delitos enumerados y no como consecuencia del azar. Por otra parte, se exige que se trata [sic] de un verdadero "asesinato", subsumible en la definición del Artículo 82:[63] **no cualquier muerte intencional** por parte del sujeto.[64]

---

[61] Pueblo v. Flores Betancourt, 124 D.P.R. 867, 878 (1989); D. Nevares Muñiz, *Nuevo Código Penal de Puerto Rico*, 2005, op. cit., a la pág. 35.

[62] El Informe hace referencia a un propuesto artículo 83 en el que se identifican los grados del asesinato y su inciso B, que hace referencia al asesinato en primer grado que se cometa como consecuencia natural de la comisión de uno de los delitos graves dispuestos. Posteriormente, ese propuesto artículo 83 quedó codificado en el artículo 106 del Código Penal de 2004.

[63] El Informe hace referencia a un propuesto artículo 82 en el que se define "asesinato". Posteriormente ese artículo 82 quedó codificado en el artículo 105 del Código Penal de 2004.

[64] (Énfasis nuestro) Propuesta del Comité de Derecho Penal de la Academia de Jurisprudencia y Legislación presentado en vista pública el 23 de septiembre de 2002 ante la Comisión de lo Jurídico del Senado de Puerto Rico, a la pág. 8. http://www.ramajudicial.pr/CodigoPenal/acrobat/20-2002_0923-Propuesta-del-Comite-de-Derecho-Penal-de-la.PDF (última visita el 12 de septiembre de 2013).

La profesora Dora Nevares Muñiz, en su análisis de la figura, expuso lo siguiente:

> El asesinato estatutario requiere que el asesinato se cometa como consecuencia natural de uno de los delitos base. **No basta que el delito base sea la causa próxima de la muerte**, sino que es necesario que la comisión del delito base, o su tentativa constituya un **riesgo típicamente relevante que se realice en el resultado**. La muerte de una persona tiene que ser una **consecuencia lógica o natural** de la consumación o tentativa del delito base.[65]

De todo lo anterior, podemos formular que la intención del legislador al redactar el delito de asesinato estatutario codificado en el artículo 106(b) del Código Penal de 2004 requería que la muerte acaecida en la comisión de uno de los delitos graves allí mencionados fuera una muerte intencional o querida conforme la naturaleza según concebida en el artículo 23(b). En otras palabras, ante los hechos imputados, el juzgador debía evaluar si en la comisión del delito grave, el sujeto conocía que el resultado final se presentaría como una consecuencia necesaria o segura de su conducta. No bastaría con que se probara que el acusado hubiese querido realizar la conducta prohibida con conocimiento de que su conducta conllevaba un riesgo considerable y no permitido de producir la muerte conforme el inciso (c), sino que constituyera un "riesgo típicamente relevante".

---

[65] D. Nevares Muñiz, *Nuevo Código Penal de Puerto Rico*, 2005, op. cit., a la pág. 143.

A otra interpretación no podríamos llegar. El texto del artículo 106(b) señala expresamente que el delito de asesinato estatutario se configura con que la muerte sea intencional como consecuencia natural de la comisión de uno de los delitos graves indicados o que el elemento subjetivo de intención sea como mínimo el correspondiente al dispuesto en el artículo 23(b). Recordemos que los tribunales tenemos el deber de interpretar la ley de manera que se le dé sentido lógico a sus disposiciones y el deber de descubrir la función para la cual fue creada la ley. Además, en materia de derecho penal los estatutos tienen que interpretarse restrictivamente y no se permite hacer caso omiso a la evidente intención del legislador.[66]

III.

Los hechos particulares del presente caso ejemplifican con claridad las circunstancias que tuvo presentes el legislador al disminuir la represión penal cuando valoró la conducta punible en la figura del asesinato estatutario tipificado en el artículo 106(b) del Código Penal de 2004. Bajo ese estatuto penal, no se podía sancionar penalmente a un individuo por una muerte acaecida en la perpetración de uno de los delitos graves mencionados, a menos que se probara que tuvo la intención de causar la muerte o sabía

---

[66] *Pueblo v. Figueroa Pomales*, 172 D.P.R. 403, 416-418 (2007); *Pueblo v. Ruiz*, 159 D.P.R. 194, 210 (2003); *Pueblo v. Martínez Yanzanis*, 142 D.P.R. 871, 877 (1997).

con alta probabilidad que la misma era un resultado seguro de sus actos.

El 26 de junio de 2010, el señor Danny Rodríguez Márquez ("Danny") estaba en los predios de una casa abandonada haciendo labores de mecánica. Frente a ese lugar, vivía su tío el señor Roberto Rodríguez Mojica ("Don Cuqui"), quien ese día también estaba "bregando" con un carro en su casa. Esa mañana, Danny vio al menor ESMR pasar en una motora por la calle existente entre el lugar donde él se encontraba y la casa de su tío. Alrededor de quince minutos después, Danny escuchó a su tío decirle que "ven acá ahora".

Al llegar a casa de su tío, Danny encontró a Don Cuqui agitado "con el pecho bien altera'o, le subía y le bajaba". Allí también vio la motora del menor ESMR tirada en el piso. Según Danny su tío le dijo que el menor ESMR "se me metió a robar", "le di un cantazo con algo por la cabeza", "se me tiró por el monte por ahí pa' abajo" y "vete y búscalo". Danny salió a mirar por un risco aledaño a la casa de Don Cuqui a ver si veía al menor.

Según el testimonio del menor ESMR, entre Don Cuqui y él se desarrolló un forcejeo en el que el señor le dio por la cabeza con un martillo. El menor ESMR alegó que como Don Cuqui lo trató de ahorcar, él empujó al señor y "me tiré por un risco".

Alrededor de veinticinco minutos más tarde, Danny regresó a casa de su tío, a quien encontró "tira'o boca abajo, con un golpe en la cabeza y morado". Don Cuqui fue trasladado a un hospital a donde llegó sin signos vitales. Esa tarde se certificó su muerte. La prueba presentada indica que Don Cuqui murió a causa de un ataque al corazón producido por un padecimiento de salud severo en el corazón y un fuerte estresor emocional.

Admitidos los hechos según expusimos anteriormente y dando por cierto que el menor ESMR entró a la casa de Don Cuqui con la intención de apropiarse ilegalmente de algo, no podemos concluir que la muerte del señor haya sido una consecuencia natural de las actuaciones del menor acusado. Primero, no hay evidencia de que el menor ESMR haya tenido la intención de matar o asesinar a Don Cuqui. Segundo, al hacer un análisis de la conducta exhibida por el menor en la comisión del escalamiento, no podemos inferir que la muerte don Cuqui, por un ataque al corazón, fuera el resultado seguro de las actuaciones del menor o que al actuar de esa forma el menor supiera que había creado un riesgo que condujera a la alta probabilidad de que Don Cuqui muriera de un ataque al corazón.

Como expusimos anteriormente, para poder imputarle al acusado la modalidad de intención por conocimiento, tendríamos que inferir que el menor ESMR pudo prever o estaba consciente de que la muerte de Don Cuqui, por un

ataque al corazón, era una consecuencia necesaria, natural o segura de su conducta al realizar el escalamiento agravado. Ello no se puede deducir de la prueba presentada. Recordemos, además, que la modalidad de intención del inciso (b) del artículo 23 no concibe una mera probabilidad, sino una alta probabilidad del resultado. La muerte de un ser humano por un ataque al corazón no es el resultado necesario o seguro de un escalamiento o un empujón.

A tono con lo anterior, estoy conforme con que revoquemos al Tribunal de Apelaciones por haber errado al confirmar la determinación de culpabilidad del menor ESMR en cuanto al delito de asesinato estatutario. Esto, porque no se probó que el menor ESMR tuvo intención de asesinar a Don Cuqui y porque no podemos inferir de la prueba presentada que el menor pudo prever que con sus actos podía causar con seguridad la muerte de Don Cuqui.

IV.

En el presente caso, la opinión mayoritaria no define el elemento subjetivo del delito de "consecuencia natural" dispuesto en el artículo 106(b) del derogado Código Penal de 2004. La Opinión escuetamente dispone que es **<u>asesinato en primer grado</u>** toda muerte intencional ocurrida 'como consecuencia natural' de la comisión de uno de los delitos base incluidos en el propio inciso (b)".[67] Con esto, no se

---

[67] (Énfasis en el original) Opinión del Tribunal, a la página 21. Véase también la página 17 de la Opinión en la que la mayoría dispone, sin mayor explicación, que "el asesinato al

deja claro la naturaleza del elemento mental de intención exigido por el legislador. A mi entender, dicha omisión ameritaba nuestra expresión.


                                        Liana Fiol Matta
                                        Jueza Asociada

---

requerir la intención tiene que producirse ya sea como consecuencia natural de los actos del sujeto no por el azar o cuando su actuación contiene un riesgo conocido y aceptado por el sujeto que decide actuar, es decir, conoce la peligrosidad objetiva de su conducta". Con ello, este Tribunal interrelaciona las modalidades de intención reconocidas en los incisos (b) y (c) del artículo 23, sin establecer la distinción que el artículo 106(b) únicamente concibe la modalidad descrita en el inciso (b) del artículo 23.