Voto concurrente emitido por la
Jueza Asociada Señora Fiol Matta,
al cual se une el Juez Presidente Señor Hernández Denton.
Concurro con la Opinión del Tribunal en el presente caso. Ello porque estoy conforme con el resultado al que llega la mayoría de que el asesinato estatutario tipificado en el Código Penal de Puerto Rico de 2004, bajo el cual se resuelve este caso, requería, como elemento mental del de-lito, la intención de matar. Sin embargo, entiendo que el legislador, al incluir la frase “consecuencia natural” en el Artículo 106(b) de ese Código Penal, 33 LPRA sec. 4734(b), quiso limitar la naturaleza de la intención exigida para que se configure el delito de asesinato estatutario. La opi-nión mayoritaria no hizo esa distinción, dejando a mi jui-cio, un análisis incompleto de los elementos del delito.
*806 I
La figura del asesinato estatutario fue introducida a nuestro ordenamiento jurídico a principios del siglo pasado.(1) En su lugar de origen, Inglaterra y en otras jurisdicciones anglosajonas, la doctrina del asesinato estatutario fue modificada y restringida continuamente hasta finalmente ser derogada.(2) En Puerto Rico, luego de varios mandatos legislativos y de limitaciones impuestas por in-terpretación judicial, el asesinato estatutario se ha mante-nido codificado como delito en el sistema jurídico penal.(3)
En términos generales, mediante la figura del asesinato estatutario se sanciona con una pena más severa a aquella persona que produce la muerte de un ser humano al per-petrar o intentar perpetrar uno de ciertos delitos graves especificados por ley.(4) Según se ha desarrollado la doctrina en Puerto Rico, para que se configure un asesinato en primer grado bajo la modalidad del asesinato estatutario no hay que probar que el acusado actuó con premeditación, deliberación o voluntad de producir la muerte, sino que basta con establecer una relación de causalidad entre el delito grave y la muerte.(5)
Con ello se configura un asesinato en primer grado “por fuerza de ley” al inferirse esa malicia de la mera comisión *807 del delito grave.(6) En el derecho penal moderno, la modalidad, conocida como “causa próxima”, ha sido altamente cuestionada, entre otras cosas, por concebir un delito que “quebranta el principio rector [...] de mens rea”, o en otras palabras, el principio de “que ninguna persona es respon-sable penalmente por haber producido cierto resultado de-lictivo, si al momento de producirlo no existía un estado mental capaz de producir dicho resultado, o la intención específica de producirlo”.(7)
No obstante la crítica, la legislatura puertorriqueña mantuvo la figura de asesinato estatutario en los códigos penales de 1902 y 1974 bajo esa modalidad; esto como un mecanismo severo para atender la alta incidencia criminal del país.(8) Ahora bien, este Tribunal reconoció que aun cuando la malicia se infiere por mandato de ley, el delito también “exige un criterio sobre causalidad”,(9) mediante el cual se entiende que cualquiera de los delitos base genera fácilmente riesgos para la vida de inocentes, que ocurran como consecuencia del mismo.(10) Así pues, se impone res-ponsabilidad al acusado cuando haya puesto en marcha una sucesión de eventos, al cometer uno de los delitos graves, que “previsiblemente conduzcan a la muerte de un ser humano”. (Énfasis suprimido).(11) La modalidad de “causa próxima” del asesinato estatutario fue sustancialmente modificada en el Código Penal de 2004.
*808 III
Mediante la Ley Núm. 149 de 18 de junio de 2004, la Asamblea Legislativa de Puerto Rico promulgó un nuevo Código Penal.(12) El nuevo estatuto incorporó el principio moderno de responsabilidad subjetiva que concibe que “[n]adie pfuede] ser sancionado por un hecho previsto en una ley penal si no lo ha realizado con intención o negligencia”.(13) Amparado en el derecho a la dignidad del ser humano, el legislador formuló el principio fundamental del derecho penal moderno en el cual “sólo cabe imputar a una persona los hechos que aparecen como obra de su voluntad o que al menos pudo prever y evitar”.(14)
Cónsono con dicho principio, el legislador puertorri-queño reformuló los elementos del delito del asesinato es-tatutario, valorando de distinta manera la conducta puni-ble, con el propósito de disminuir la represión penal. Expresamente, el Artículo 106(b) del Código Penal de 2004 dispuso que
[c]onstituye asesinato en primer grado: Todo asesinato que se comete como consecuencia natural de la consumación o tenta-tiva de algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un me-nor, estrago, envenenamiento de aguas de uso público, agre-sión grave en su modalidad mutilante, fuga, maltrato inten-cional o abandono de un menor.
El Artículo 105 del Código Penal de 2004 definió “asesi-nato” como “dar muerte a un ser humano con intención de causársela”. (Enfasis nuestro).(15) Así, como expresa la Opi-nión del Tribunal, “el asesinato estatutario qued[ó] reser-vado para aquellos ‘asesinatos’, conforme a la definición de *809 asesinato contenida en el Código Penal”.(16) Por lo tanto, la única interpretación que le podemos dar a la voluntad de nuestra Asamblea Legislativa al aprobar el Artículo 106(b) de dicho cuerpo normativo es que, para que se pueda pe-nalizar como asesinato en primer grado una muerte acaecida en la perpetración de uno de los delitos graves o su tentativa, el acusado tiene que haber tenido la intención de causar la muerte. Conforme a ese cambio sustancial, en Pueblo v. González, 165 DPR 675 (2005), se cuestionó la existencia de la figura del asesinato estatutario en el Có-digo Penal de 2004. Allí resolvimos que el asesinato estatutario no fue derogado en ese cuerpo legal, sino que se mantuvo vigente, pero incorporando la exigencia de que el asesinato se cometiese como consecuencia natural de los delitos graves allí identificados.(17)
La frase “consecuencia natural” no es ajena al ordena-miento jurídico penal que estudiamos. Específicamente, el Artículo 23 del Código Penal de 2004 define el elemento subjetivo de intención y en su inciso (b) incluye “consecuen-cia natural” como un modo de intención. El Artículo 23 del Código Penal de 2004 dispuso:
El delito se considera cometido con intención:
(a) Cuando el hecho correspondiente ha sido realizado por una conducta dirigida voluntariamente a ejecutarlo;
(b) el hecho correspondiente es una consecuencia natural de la conducta voluntaria del autor, o
(c) cuando el sujeto ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de produ-cir el hecho delictivo realizado.(18)
Los estudiosos del Derecho han definido la intención criminal como algún tipo de querer, por lo que se entiende *810 que “actúa intencionalmente quien ‘quiere’ realizar el com-portamiento prohibido y, además, ‘conoce’ que junto con su acción concurren las circunstancias concomitantes que es-tablecen la existencia de un delito”.(19) Según hemos reco-nocido, el Artículo 23 divide el elemento subjetivo de inten-ción en tres modalidades: propósito, conocimiento, y temeridad.(20) La intención con propósito del inciso (a), ad-mite que el sujeto tiene como objetivo consciente realizar el acto delictivo, o producir el hecho delictivo.(21)
En cuanto a la naturaleza de la intención que indica el inciso (b), “se entiende que actúa con intención o dolo directo de segundo grado quien ha previsto que la consecuen-cia necesaria o natural de su conducta es la realización del hecho delictivo”.(22) Se conoce también como la modalidad de intención por conocimiento que provee que el sujeto “ac-túa ‘a sabiendas’ de que mediante su conducta segura-mente cometerá los elementos de un tipo penal”.(23) Según lo ha señalado el profesor Chiesa Aponte:
No basta con que el autor esté consciente de que existe al-guna probabilidad de que su acción produzca el hecho delictivo para que se considere que actuó “con conocimiento”. Se re-quiere, además, que el actor haya previsto que existía una alta probabilidad de que se realizara la conducta prohibida. (Énfa-sis en el original).(24)
Cónsono con lo anterior, el modo de intención del inciso (b) del Artículo 23 exige que el sujeto conozca que la pro-ducción del hecho delictivo es prácticamente segura y que *811 el riesgo que crea con su conducta supone una alta proba-bilidad de producir el hecho delictivo.(25) La conducta vo-luntaria del autor "no tiene como objetivo consciente la comisión del delito”, pero admite como seguro que su actuación dará lugar al delito.(26)
En cuanto a la intención definida en el inciso (c) del Artículo 23 o la modalidad de intención por temeridad, el profesor Chiesa Aponte señala que se entiende que el su-jeto actúa intencionalmente porque tiene conciencia de que su conducta “implicaba un riesgo considerable y no permi-tido de producir el hecho delictivo realizado”.(27) Para determinar si el riesgo creado fue injustificado es necesario tomar en consideración la magnitud del riesgo y si las razones que tenía el autor para crear el riesgo son conside-radas no permitidas por la sociedad.(28)
El elemento mental constituye una cuestión de hecho a ser evaluada por el juzgador de los hechos a base de las circunstancias relacionadas con el delito y la conducta del imputado. Por lo general, por ser una cuestión subjetiva, los tribunales deberán inferir el estado anímico que refle-jen las manifestaciones del imputado.(29)
La Academia Puertorriqueña de Jurisprudencia y Legis-lación, en su ponencia ante el Senado sobre el asesinato estatutario explicó que:
En la letra (B)(30) se mantiene la figura del asesinato esta- *812 tutario, pero se incorpora la exigencia de qne el asesinato se cometa como consecuencia natural de los delitos que se mencionan. Sólo entonces el asesinato aparece como realiza-ción de la peligrosidad propia de los delitos enumerados y no como consecuencia del azar. Por otra parte, se exige que se trata [sic] de un verdadero “asesinato”, subsumible en la defi-nición del art. 82(31) no cualquier muerte, sino sólo la muerte intencional por parte del sujeto. (Énfasis nuestro).(32)
La Prof.a Dora Nevares-Muñiz, en su análisis de la figura, expuso lo siguiente:
[E]l asesinato estatutario requiere que el asesinato se cometa como consecuencia natural de uno de los delitos base. No basta que el delito base sea la causa próxima de la muerte, sino que es necesario que la comisión del delito base, o su tentativa constituya un riesgo típicamente relevante que se realice en el resultado. La muerte de una persona tiene que ser una consecuencia lógica o natural de la consumación o tentativa del delito base. (Énfasis nuestro).(33)
De todo lo anterior, podemos formular que la intención del legislador al redactar el delito de asesinato estatutario codificado en el Artículo 106(b) del Código Penal de 2004 requería que la muerte acaecida en la comisión de uno de los delitos graves allí mencionados fuera una muerte inten-cional o querida conforme la naturaleza, según concebida en el Artículo 23(b). En otras palabras, ante los hechos impu-tados, el juzgador debía evaluar si en la comisión del delito grave, el sujeto conocía que el resultado final se presentaría como una consecuencia necesaria o segura de su conducta. *813 No bastaría con que se probara que el acusado hubiese que-rido realizar la conducta prohibida con conocimiento de que su conducta conllevaba un riesgo considerable y no permi-tido de producir la muerte conforme el inciso (c), sino que constituyera un “riesgo típicamente relevante”.
A otra interpretación no podríamos llegar. El texto del Artículo 106(b) señala expresamente que el delito de ase-sinato estatutario se configura con que la muerte sea in-tencional como consecuencia natural de la comisión de uno de los delitos graves indicados o que el elemento subjetivo de intención sea como mínimo el correspondiente al dis-puesto en el Artículo 23(b). Recordemos que los tribunales tenemos el deber de interpretar la ley de manera que se le dé sentido lógico a sus disposiciones y el deber de descubrir la función para la cual fue creada la ley. Además, en mate-ria de derecho penal los estatutos tienen que interpretarse restrictivamente y no se permite hacer caso omiso a la evi-dente intención del legislador.(34)
III
Los hechos particulares del presente caso ejemplifican con claridad las circunstancias que tuvo presentes el legis-lador al disminuir la represión penal cuando valoró la con-ducta punible en la figura del asesinato estatutario tipifi-cado en el Artículo 106(b) del Código Penal de 2004. Bajo ese estatuto penal, no se podía sancionar penalmente a un individuo por una muerte acaecida en la perpetración de uno de los delitos graves mencionados, a menos que se pro-bara que tuvo la intención de causar la muerte o sabía con alta probabilidad que la misma era un resultado seguro de sus actos.
*814 El 26 de junio de 2010, el Sr. Danny Rodríguez Márquez (Danny) estaba en los predios de una casa abandonada ha-ciendo labores de mecánica. Frente a ese lugar, vivía su tío el Sr. Roberto Rodríguez Mojica (Don Cuqui), quien ese día también estaba “bregando” con un carro en su casa. Esa mañana, Danny vio al menor ESMR pasar en una motora por la calle existente entre el lugar donde él se encontraba y la casa de su tío. Alrededor de quince minutos después, Danny escuchó a su tío decirle “ven acá ahora”.
Al llegar a casa de su tío, Danny encontró a Don Cuqui agitado “con el pecho bien altera’o, le subía y le bajaba”. Allí también vio la motora del menor ESMR tirada en el piso. Según Danny, su tío le dijo que el menor ESMR “se me me-tió a robar”; “le di un cantazo con algo por la cabeza”; “se me tiró por el monte por ahí pa’ abajo”, y “vete y búscalo”. Danny salió a mirar por un risco aledaño a la casa de Don Cuqui a ver si veía al menor.
Según el testimonio del menor ESMR, entre Don Cuqui y él se desarrolló un forcejeo en el que el señor le dio por la cabeza con un martillo. El menor ESMR alegó que como Don Cuqui lo trató de ahorcar, él empujó al señor y “me tiré por un risco”.
Alrededor de veinticinco minutos más tarde, Danny re-gresó a casa de su tío, a quien encontró “tira’o boca abajo, con un golpe en la cabeza y morado”. Don Cuqui fue trasla-dado a un hospital a donde llegó sin signos vitales. Esa tarde se certificó su muerte. La prueba presentada indica que Don Cuqui murió a causa de un ataque al corazón pro-ducido por un padecimiento de salud severo en el corazón y un fuerte estresor emocional.
Admitidos los hechos según expusimos anteriormente y dando por cierto que el menor ESMR entró a la casa de Don Cuqui con la intención de apropiarse ilegalmente de algo, no podemos concluir que la muerte del señor haya sido una consecuencia natural de las actuaciones del me-nor acusado. Primero, no hay evidencia de que el menor *815 ESMR haya tenido la intención de matar o asesinar a Don Cuqui. Segundo, al hacer un análisis de la conducta exhi-bida por el menor en la comisión del escalamiento, no po-demos inferir que la muerte don Cuqui, por un ataque al corazón, fuera el resultado seguro de las actuaciones del menor o que al actuar de esa forma el menor supiera que había creado un riesgo que condujera a la alta probabilidad de qué Don Cuqui muriera de un ataque al corazón.
Como expusimos anteriormente, para poder imputar al acusado la modalidad de intención por conocimiento, ten-dríamos que inferir que el menor ESMR pudo prever o es-taba consciente de que la muerte de Don Cuqui, por un ata-que al corazón, era una consecuencia necesaria, natural o segura de su conducta al realizar el escalamiento agravado. Ello no se puede deducir de la prueba presentada. Recorde-mos, además, que la modalidad de intención del inciso (b) del Artículo 23 no concibe una mera probabilidad, sino una alta probabilidad del resultado. La muerte de un ser hu-mano por un ataque al corazón no es el resultado necesario o seguro de un escalamiento o un empujón.
A tono con lo anterior, estoy conforme con que revoque-mos al Tribunal de Apelaciones por haber errado al confir-mar la determinación de culpabilidad del menor ESMR en cuanto al delito de asesinato estatutario. Esto, porque no se probó que el menor ESMR tuvo intención de asesinar a Don Cuqui y porque no podemos inferir de la prueba presentada que el menor pudo prever que con sus actos podía causar con seguridad la muerte de Don Cuqui.
IV
En el presente caso, la opinión mayoritaria no define el elemento subjetivo del delito de “consecuencia natural” dispuesto en el Artículo 106(b) del derogado Código Penal de 2004. La Opinión escuetamente dispone que es “asesinato en primer grado toda muerte intencional ocurrida ‘como *816 consecuencia natural’ de la comisión de uno de los delitos base incluidos en el propio inciso (b)”. (Énfasis en el original).(35) Con esto, no se deja claro la naturaleza del elemento mental de intención exigido por el legislador. A mi entender, dicha omisión ameritaba nuestra expresión.

 Para un análisis de la trayectoria de la doctrina del asesinato estatutario, véase Pueblo v. Lucret Quiñones, 111 DPR 716 (1981).

 Pueblo v. Lucret Quiñones, supra, págs. 726 y 729. Véase, además, la Opinión mayoritaria, págs. 803-804.

 Art. 201 del Código Penal de Puerto Rico de 1 de mayo de 1902; Art. 83 del Código Penal de del 22 de julio de 1974; Art. 106 del Código Penal de 18 de junio de 2004; Art. 93 del Código Penal de Puerto Rico de 30 de julio de 2012.

 Pueblo v. Lucret Quiñones, supra, pág. 721; D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, Hato Rey, Instituto para el Desarrollo del Derecho, 2005, págs. 142-143.

 Pueblo v. Rivera Torres, 121 DPR 128, 137-138 (1988). Nevares-Muñiz, op. cit., pág. 143.

 Pueblo v. Rivera Torres, supra, pág. 136; Pueblo v. Rodríguez Rivera, 84 DPR 299, 304 (1961).

 Pueblo v. Lucret Quiñones, supra, págs. 731-732.

 Pueblo v. Rivera Torres, supra, pág. 137; Pueblo v. Calderón Laureano, 113 DPR 574, 578-579 (1982).

 Pueblo v. Robles González, 132 DPR 554, 563-564 (1993).

 Íd. Véase, además, Pueblo v. Calderón Laureano, supra, págs. 578-579.

 Pueblo v. Torres Ramos, 121 DPR 747, 752 (1988).

 Exposición de Motivos de la Ley Núm. 149 de 18 de junio de 2004, (Parte 1) Leyes de Puerto Rico 879 (33 LPRA sec. 4629 et seq.).

 Art. 22 del Código Penal de 2004 (33 LPRA sec. 4660).

 Nevares-Muñiz, op. cit, pág. 31.

 33 LPRA sec. 4733.

 Opinión del Tribunal, pág. 802.

 Pueblo v. González, 165 DPR 675, 709 (2005). En ese caso declinamos definir la frase “consecuencia natural” dispuesta en el Artículo 106(b) del Código Penal de 2004 porque los hechos imputados eran penalizados bajo el delito de asesinato esta-tutario codificado en el Código Penal de 1974.

 33 LPRA sec. 4651.

 L.E. Chiesa Aponte, Derecho penal sustantivo, Estados Unidos, Pubs. JTS, 2007, pág. 143.

 Pueblo v. Sustache Sustache, 176 DPR 250, 312 (2009). Véase, además, Chiesa Aponte, op, cit., pág. 159.

 Chiesa Aponte, op. cit., pág. 144.

 Pueblo v. Sustache Sustache, supra, pág. 312; Chiesa Aponte, op. cit., pág. 146.

 Chiesa Aponte, op. cit., págs. 146 y 160.

 Íd., págs. 146-147.

 Pueblo v. Rivera Cuevas, 181 DPR 699, 712 (2011); Chiesa Aponte, op. cit., pág. 163.

 Nevares-Muñiz, op. cit., pág. 35; Chiesa Aponte, op. cit., pág. 147.

 Chiesa Aponte, op. cit., pág. 160.

 Íd. Véase, además, D. Nevares-Muñiz, Código Penal de Puerto Rico, San Juan, Instituto para el Desarrollo del Derecho, 2012, págs. 45-46.

 Pueblo v. Flores Betancourt, 124 DPR 867, 878 (1989); Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, op. cit, pág. 35.

 Informe hace referencia a un propuesto Artículo 83 en el que se identifi-can los grados del asesinato y su inciso B, que hace referencia al asesinato en primer grado que se cometa como consecuencia natural de la comisión de uno de los delitos *812 graves dispuestos. Posteriormente, ese propuesto Artículo 83 quedó codificado en el Artículo 106 del Código Penal de 2004.

 El Informe hace referencia a un propuesto Artículo 82 en el que se define “asesinato”. Posteriormente ese Artículo 82 quedó codificado en el Artículo 105 del Código Penal de 2004.

 Propuesta del Comité de Derecho Penal de la Academia de Jurisprudencia y Legislación presentado en vista pública el 23 de septiembre de 2002 ante la Comisión de lo Jurídico del Senado de Puerto Rico, pág. 8, http://www.ramajudicial.pr/ CodigoPenal/acrobat/20-2002-0923-Propuesta-del- Comite-de-Derecho-Penal-de-la.PDP (última visita, 12 de septiembre de 2013).

 Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, ed. 2005, op. cit., pág. 143.

 Pueblo v. Figueroa Pomales, 172 DPR 403, 416-418 (2007); Pueblo v. Ruiz, 159 DPR 194, 210 (2003); Pueblo v. Martínez Yanzanis, 142 DPR 871, 877 (1997).

 Opinión del Tribunal, pág. 802. Véase también la pág. 799 de la Opinión del Tribunal en la que la mayoría dispone, sin mayor explicación, que “el asesinato, al requerir la intención, tiene que producirse ya sea como consecuencia natural de los actos del sujeto —no por el azar— o cuando su actuación contiene un riesgo conocido y aceptado por el sujeto que decide actuar, es decir, conoce la peligrosidad objetiva de su conducta”. Con ello, este Tribunal interrelaciona las modalidades de intención reconocidas en los incisos (b) y (c) del Artículo 23, sin establecer la distinción de que el Artículo 106(b) únicamente concibe la modalidad descrita en el inciso (b) del Artí-culo 23.